**BILL GRAHAM ARCHIVES,**
Plaintiff–Appellant,

v.

**DORLING KINDERSLEY LIMITED,**
**Dorling Kindersley Publishing, Inc.**
**and RR Donnelley & Sons Company,**
Defendants–Appellees.

**Docket No. 05–2514–CV.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 4, 2006.

Decided May 9, 2006.

---

William F. Patry (Paul M. Fakler, on the brief), Thelen Reid & Priest LLP, for Plaintiff–Appellant.

Richard Dannay (Thomas Kjellberg, on the brief), Cowan, Liebowitz & Latman, P.C., for Defendants–Appellees.

Before: KEARSE and RAGGI, Circuit Judges, and RESTANI,* Judge.

RESTANI, Judge.

This appeal concerns the scope of copyright protection afforded artistic concert posters reproduced in reduced size in a biography of the musical group the Grateful Dead. Asserted copyright holder Bill Graham Archives, LLC ("BGA" or "Appel-

---

* The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

lant") appeals from a judgment of the District Court for the Southern District of New York dismissing, on motion for summary judgment, its copyright infringement action against Dorling Kindersley Limited, Dorling Kindersley Publishing, Inc., and R.R. Donnelley & Sons Company (collectively "DK" or "Appellees"). We review the district court's grant of summary judgment *de novo*, and we agree with the court that DK's reproduction of BGA's images is protected by the fair use exception to copyright infringement.

## BACKGROUND

In October of 2003, DK published *Grateful Dead: The Illustrated Trip* ("*Illustrated Trip*"), in collaboration with Grateful Dead Productions, intended as a cultural history of the Grateful Dead. The resulting 480–page coffee table book tells the story of the Grateful Dead along a timeline running continuously through the book, chronologically combining over 2000 images representing dates in the Grateful Dead's history with explanatory text. A typical page of the book features a collage of images, text, and graphic art designed to simultaneously capture the eye and inform the reader. Plaintiff BGA claims to own the copyright to seven images displayed in *Illustrated Trip*, which DK reproduced without BGA's permission.

Initially, DK sought permission from BGA to reproduce the images. In May of 2003, the CEO of Grateful Dead Productions sent a letter to BGA seeking permission for DK to publish the images. BGA

responded by offering permission in exchange for Grateful Dead Productions' grant of permission to BGA to make CDs and DVDs out of concert footage in BGA's archives. Next, DK directly contacted BGA seeking to negotiate a license agreement, but the parties disagreed as to an appropriate license fee. Nevertheless, DK proceeded with publication of *Illustrated Trip* without entering a license fee agreement with BGA. Specifically, DK reproduced seven artistic images originally depicted on Grateful Dead event posters and tickets.[1] BGA's seven images are displayed in significantly reduced form and are accompanied by captions describing the concerts they represent.

When DK refused to meet BGA's post-publication license fee demands, BGA filed suit for copyright infringement. BGA sought to enjoin further publication of *Illustrated Trip*, the destruction of all unsold books, and actual and statutory damages. The parties cross-moved for summary judgment, with the primary issue before the district court being whether DK's use of BGA's images constituted fair use under the Copyright Act of 1976, 17 U.S.C. § 101 et seq. ("Copyright Act"). After applying the statutory fair use balancing test, the district court determined that DK's reproduction of the images was fair use and granted DK's motion for summary judgment.

## DISCUSSION

Section 106 of the Copyright Act grants copyright holders a bundle of exclusive

1. The disputed images appear as follows: (1) on page 76, a concert poster for the Grateful Dead, Jefferson Airplane, and Big Brother and the Holding Company playing at the Hollywood Bowl; (2) on page 103, a concert poster for the Grateful Dead, Jefferson Airplane, and Sons of Champlin playing at the Winterland Arena; (3) on page 130, a picture of the front and back of a concert ticket for a show at the Fillmore Theatre, reused for a Grateful Dead concert at the Winterland Arena; (4) on page 254, a concert poster for Grateful Dead shows at the Warfield Theatre; (5) on page 361, a concert poster for a Grateful Dead show at the Oakland Coliseum; (6) on page 397, a concert poster for a Grateful Dead show on New Year's Eve; and (7) on page 421, a fake in-house poster for a New Year's Eve 1993 concert.

rights, including the right to "reproduce the copyrighted work in copies," and the right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106. For purposes of the motion, the district court assumed plaintiff possessed these rights in the contested images and there is no dispute that copying the images was not authorized by plaintiff. The issue before us on appeal, as it was in the district court, is whether DK's unauthorized use of BGA's copyrighted images is fair use.

The fair use doctrine is a statutory exception to copyright infringement. Section 107 of the Copyright Act permits the unauthorized use or reproduction of copyrighted work if it is "for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research." 17 U.S.C. § 107. Whether such "fair use" exists involves a case-by-case determination using four non-exclusive, statutorily provided factors in light of the purposes of copyright. *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). The factors are: (1) "the purpose and character of the use;" (2) "the nature of the copyrighted work;" (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole;" and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. "The ultimate test of fair use ... is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Castle Rock Entm't, Inc. v. Carol Publ'g Group*, 150 F.3d 132, 141 (2d Cir.1998) (internal citations and quotation marks omitted).

In this case, the district court concluded that the balance of fair use factors weighs in favor of DK. Although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues. *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991). As there are no genuine issues of material fact here, we review the district court's legal conclusions *de novo*. *New Era Publ'ns Int'l, ApS v. Carol Publ'g Group*, 904 F.2d 152, 155 (2d Cir.1990). We agree with the district court that DK's use of the copyrighted images is protected as fair use.

## I. Purpose and Character of Use

We first address "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).[2] Most important to the court's analysis of the first factor is the "transformative" nature of the work. *See* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L.Rev. 1105, 1111 (1990). The question is "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (internal citations and quotation marks omitted) (alteration in original).

Here, the district court determined that *Illustrated Trip* is a biographical work, and the original images are not, and therefore accorded a strong presumption in fa-

---

**2.** Obviously, the use here is of a general commercial nature rather than a non-profit nature, but the inquiry is both a broader one and a narrower one than may appear at first glance as will be explained.

vor of DK's use. In particular, the district court concluded that DK's use of images placed in chronological order on a timeline is transformatively different from the mere expressive use of images on concert posters or tickets. Because the works are displayed to commemorate historic events, arranged in a creative fashion, and displayed in significantly reduced form, the district court held that the first fair use factor weighs heavily in favor of DK.

Appellant challenges the district court's strong presumption in favor of fair use based on the biographical nature of *Illustrated Trip*. Appellant argues that based on this purported error the district court failed to examine DK's justification for its use of each of the images. Moreover, Appellant argues that as a matter of law merely placing poster images along a timeline is not a transformative use. Appellant asserts that each reproduced image should have been accompanied by comment or criticism related to the artistic nature of the image.

We disagree with Appellant's limited interpretation of transformative use and we agree with the district court that DK's actual use of each image is transformatively different from the original expressive purpose. Preliminarily, we recognize, as the district court did, that *Illustrated Trip* is a biographical work documenting the 30–year history of the Grateful Dead. While there are no categories of presumptively fair use, *see Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. at 584, 114 S.Ct. 1164, courts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects. *See* 17 U.S.C. § 107 (stating that fair use of a copyrighted work "for purposes such as

criticism, comment ... [or] scholarship ... is not an infringement of copyright"); *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 932 (2d Cir.1994) (Jacobs, J., dissenting) (noting that "[m]uch of our fair use case law has been generated by the use of quotation in biographies, a practice that fits comfortably within the[ ] statutory categories of uses illustrative of uses that can be fair") (internal quotation marks omitted) (alteration in original); *Salinger v. Random House, Inc.*, 811 F.2d 90, 96 (2d Cir.1987) (holding that quotation of Salinger's letters in a biography could be considered criticism, scholarship, and research, which are among the illustrative statutory categories of fair use enumerated in 17 U.S.C. § 107). No less a recognition of biographical value is warranted in this case simply because the subject made a mark in pop culture rather than some other area of human endeavor. *See Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1374 (2d Cir.1993) (noting that a work that comments about "pop culture" is not removed from the scope of Section 107 simply because it is not erudite).

In the instant case, DK's purpose in using the copyrighted images at issue in its biography of the Grateful Dead is plainly different from the original purpose for which they were created. Originally, each of BGA's images fulfilled the dual purposes of artistic expression and promotion. The posters were apparently widely distributed to generate public interest in the Grateful Dead and to convey information to a large number people about the band's forthcoming concerts. In contrast, DK used each of BGA's images as historical artifacts to document and represent the actual occurrence of Grateful Dead concert events featured on *Illustrated Trip*'s timeline.

In some instances, it is readily apparent that DK's image display enhances the

reader's understanding of the biographical text.[3] In other instances, the link between image and text is less obvious; nevertheless, the images still serve as historical artifacts graphically representing the fact of significant Grateful Dead concert events selected by the *Illustrated Trip*'s author for inclusion in the book's timeline.[4] We conclude that both types of uses fulfill DK's transformative purpose of enhancing the biographical information in *Illustrated Trip*, a purpose separate and distinct from the original artistic and promotional purpose for which the images were created. *See Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 628–29 (9th Cir.2003) (finding the use of television clips to be transformative where "the clips play for only a few seconds and are used for reference purposes while a narrator talks over them or interviewees explain their context in Elvis' career," but not to be transformative where the clips "play without much interruption, [and t]he purpose of showing these clips likely goes beyond merely making a reference for a biography, but instead serves the same intrinsic entertainment value that is protected by Plaintiffs' copyrights"); *see also Hofheinz v. A & E Television Networks, Inc.*, 146 F.Supp.2d 442, 446–47 (S.D.N.Y.2001) (ruling that unauthorized inclusion of copyrighted film clips in actor's biographical film was protected fair use because the biography "was not shown to recreate the creative expression reposing in plaintiff's [copyrighted] film, [but] for the transformative purpose

3. For example, BGA claims copyright infringement of a concert poster image, reproduced on page 254 of *Illustrated Trip*, depicting two skeletons flanking the Warfield Theatre. The reader is expected to view this image together with the text on pages 254 and 255 under the caption, "The Warfield/Radio City Shows," and with a noncontested image on page 255, depicting two skeletons flanking the Radio City Music Hall. In this instance, the text specifically comments on the poster image, explaining:

> The Dead's real 15th anniversary celebration in 1980 spanned two months, two coasts, and eventually two albums .... The bicoastal settings for the shows were very different—San Francisco's Warfield Theatre was an intimate house of 2,400 seats, while New York City's Radio City Music Hall was, well, Radio City—but the Dead's performances in both produced some of the most treasured moments of the band's early '80s period .... The [Dead's] otherwise brilliant Radio City run was marred by a bizarre dispute between the band and Radio City's management. The latter objected to promotional posters showing the inevitable skeletons flanking the venerable venue. Evidently not well versed in Grateful Dead iconography, the Radio City execs interpreted the posters as a coded message that the band thought that Radio City's days were numbered, and they slapped the band with a million-dollar lawsuit. The misunderstanding was quickly cleared up.

The author uses images to enhance the reader's understanding of the statement that Radio City Music Hall executives were unfamiliar with Grateful Dead iconography by displaying nearly identical concert promotion posters for the Warfield Theatre and the Radio City Music Hall.

4. For example, BGA claims copyright infringement of a concert poster image, reproduced on page 103 of *Illustrated Trip*, promoting a concert at the Winterland Arena. The reader is expected to view this image together with an entry on the timeline for October 24, 25, and 26, accompanying text describing the shows, and a quotation from Bill Graham to the audience on Saturday, October 25. The text describes the show as follows:

> Hot Tuna, Jefferson Airplane, and Sons of Champlin play all three nights. On Saturday Stephen Stills may have played on "Turn on Your Lovelight." Sunday marks the last "Doin' that Rag."

While the concert poster image does not necessarily enhance the reader's understanding of the text, it serves as a recognizable representation of the concert. It also documents concert information and provides notable historic details, such as the fact that, at this relatively early stage of its career, the Grateful Dead received second billing to Jefferson Airplane.

of enabling the viewer to understand the actor's modest beginnings in the film business"). In sum, because DK's use of the disputed images is transformative both when accompanied by referencing commentary and when standing alone, we agree with the district court that DK was not required to discuss the artistic merits of the images to satisfy this first factor of fair use analysis.

This conclusion is strengthened by the manner in which DK displayed the images. First, DK significantly reduced the size of the reproductions. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818–20 (9th Cir. 2003) (finding online search engine's use of thumbnail-sized images to be highly transformative). While the small size is sufficient to permit readers to recognize the historical significance of the posters, it is inadequate to offer more than a glimpse of their expressive value. In short, DK used the minimal image size necessary to accomplish its transformative purpose.

Second, DK minimized the expressive value of the reproduced images by combining them with a prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book. To further this collage effect, the images are displayed at angles and the original graphical artwork is designed to blend with the images and text. Overall, DK's layout ensures that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, not to exploit copyrighted artwork for commercial gain. *See Hofheinz*, 146 F.Supp. at 446.

Third, BGA's images constitute an inconsequential portion of *Illustrated Trip*. The extent to which unlicensed material is used in the challenged work can be a factor in determining whether a biographer's use of original materials has been sufficiently transformative to constitute

fair use. *See Craft v. Kobler*, 667 F.Supp. 120, 129 (S.D.N.Y.1987) (Leval, J.) (finding biography of Stravinsky to be unfair in part because the takings were numerous and were the "liveliest and most entertaining part of the biography"). Although our circuit has counseled against considering the percentage the allegedly infringing work comprises of the copyrighted work in conducting *third-factor* fair use analysis, *see NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 480 (2d Cir.2004), several courts have done so, *see, e.g., Harper*, 471 U.S. at 565–66, 105 S.Ct. 2218 (finding the fact that quotes from President Ford's unpublished memoirs played a central role in the allegedly infringing magazine article, constituting 13% of that article, weighed against a finding of fair use); *Salinger*, 811 F.2d at 98–99 (finding the fact that letters are quoted or paraphrased on approximately 40% of the book's 192 pages weighs against fair use). We find this inquiry more relevant in the context of *first-factor* fair use analysis.

In the instant case, the book is 480 pages long, while the BGA images appear on only seven pages. Although the original posters range in size from 13″ × 19″ to more than 19″ × 27," the largest reproduction of a BGA image in *Illustrated Trip* is less than 3″ × 4½," less than 1/20 the size of the original. And no BGA image takes up more than one-eighth of a page in a book or is given more prominence than any other image on the page. In total, the images account for less than one-fifth of one percent of the book. This stands in stark contrast to the wholesale takings in cases such as those described above, and we are aware of no case where such an insignificant taking was found to be an unfair use of original materials.

Finally, as to this first factor, we briefly address the commercial nature of *Illustrated Trip. See Harper*, 471 U.S. at

562, 105 S.Ct. 2218 (stating that the fact that the purpose of a new use is commercial weighs against finding fair use). Even though *Illustrated Trip* is a commercial venture, we recognize that "nearly all of the illustrative uses listed in the preamble paragraph of § 107 ... are generally conducted for profit ...." *Campbell,* 510 U.S. at 584, 114 S.Ct. 1164 (internal quotation marks omitted). Moreover, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper,* 471 U.S. at 562, 105 S.Ct. 2218. Here, *Illustrated Trip* does not exploit the use of BGA's images as such for commercial gain. Significantly, DK has not used any of BGA's images in its commercial advertising or in any other way to promote the sale of the book. *Illustrated Trip* merely uses pictures and text to describe the life of the Grateful Dead. By design, the use of BGA's images is incidental to the commercial biographical value of the book.

Accordingly, we conclude that the first fair use factor weighs in favor of DK because DK's use of BGA's images is transformatively different from the images' original expressive purpose and DK does not seek to exploit the images' expressive value for commercial gain.

## II. Nature of the Copyrighted Work

■ The second factor in a fair use determination is "the nature of the copyrighted work." 17 U.S.C. § 107(2). To resolve this inquiry the court considers "the protection of the reasonable expectations of one who engages in the kinds of creation/authorship that the copyright seeks to encourage." Leval, *supra,* at 1122. "[C]reative expression for public dissemination falls within the core of the copyright's protective purposes." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164.

■ The district court determined that the second factor weighs against DK because the images are creative artworks, which are traditionally the core of intended copyright protection. Nevertheless, the court limited the weight it placed on this factor because the posters have been published extensively. Appellant agrees that the district court properly weighed the second factor against DK, although it questions the lesser protection given to published works. Appellees counter that because the images are mixed factual and creative works and have been long and extensively published, the second factor tilts toward fair use.

We agree with the district court that the creative nature of artistic images typically weighs in favor of the copyright holder. We recognize, however, that the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose. *See Campbell,* 510 U.S. at 586, 114 S.Ct. 1164 (stating that the second factor is not "likely to help much in separating the fair use sheep from the infringing goats" in cases involving transformative copying of "publicly known, expressive works"). This is not a case such as *Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70 (2d Cir.1997), in which we held that the creative work was being used for the same decorative purpose as the original. Here, we conclude that DK is using BGA's images for the transformative purpose of enhancing the biographical information provided in *Illustrated Trip.* Accordingly, we hold that even though BGA's images are creative works, which are a core concern of copyright protection, the second factor has limited weight in our analysis because the purpose of DK's use was to emphasize the

images' historical rather than creative value.

## III. Amount and Substantiality of the Portion Used

The third fair use factor asks the court to examine "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). We review this factor with reference to the copyrighted work, not the infringing work. *New Era*, 904 F.2d at 159. The court must examine the quantitative and qualitative aspects of the portion of the copyrighted material taken. *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164.

▮ The district court determined that even though the images are reproduced in their entirety, the third fair use factor weighs in favor of DK because the images are displayed in reduced size and scattered among many other images and texts. In faulting this conclusion, Appellant contends that the amount used is substantial because the images are copied in their entirety. Neither our court nor any of our sister circuits has ever ruled that the copying of an entire work *favors* fair use. At the same time, however, courts have concluded that such copying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image. *See Kelly*, 336 F.3d at 821 (concluding that images used for a search engine database are necessarily copied in their entirety for the purpose of recognition); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir.2000) (concluding that to copy any less than the entire image would have made the picture useless to the story). Adopting this reasoning, we conclude that the third-factor inquiry must take into account that the "the extent of permissible copying varies with the purpose and char-

acter of the use." *Campbell*, 510 U.S. at 586–87, 114 S.Ct. 1164.

Here, DK used BGA's images because the posters and tickets were historical artifacts that could document Grateful Dead concert events and provide a visual context for the accompanying text. To accomplish this use, DK displayed reduced versions of the original images and intermingled these visuals with text and original graphic art. As a consequence, even though the copyrighted images are copied in their entirety, the visual impact of their artistic expression is significantly limited because of their reduced size. *See Kelly*, 336 F.3d at 821 (concluding that thumbnails are not a substitute for full-size images). We conclude that such use by DK is tailored to further its transformative purpose because DK's reduced size reproductions of BGA's images in their entirety displayed the minimal image size and quality necessary to ensure the reader's recognition of the images as historical artifacts of Grateful Dead concert events. Accordingly, the third fair use factor does not weigh against fair use.

## IV. Effect of the Use upon the Market for or Value of the Original

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The court looks to not only the market harm caused by the particular infringement, but also to whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work. *Harper*, 471 U.S. at 568, 105 S.Ct. 2218. This analysis requires a balancing of "the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir.1981).

In the instant case, the parties agree that DK's use of the images did not impact BGA's primary market for the sale of the poster images. Instead, we look to whether DK's unauthorized use usurps BGA's potential to develop a derivative market. Appellant argues that DK interfered with the market for licensing its images for use in books. Appellant contends that there is an established market for licensing its images and it suffered both the loss of royalty revenue directly from DK and the opportunity to obtain royalties from others.

"It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Texaco*, 60 F.3d at 929 (citations omitted). We have noted, however, that "were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder." *Id.* at 930 n. 17 (emphasis added); *see Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381, 1387 (6th Cir.1996) (stating that a copyright holder must have a right to copyright revenues before finding that a failure to pay a license fee equals market harm); Leval, *supra*, at 1124 (stating that "[b]y definition every fair use involves

some loss of royalty revenue because the secondary user has not paid royalties"); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][4] (2005) (stating that "it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar"). Accordingly, we do not find a harm to BGA's license market merely because DK did not pay a fee for BGA's copyrighted images.

Instead, we look at the impact on potential licensing revenues for "traditional, reasonable, or likely to be developed markets." *Texaco*, 60 F.3d at 930. In order to establish a traditional license market, Appellant points to the fees paid to other copyright owners for the reproduction of their images in *Illustrated Trip*. Moreover, Appellant asserts that it established a market for licensing its images, and in this case expressed a willingness to license images to DK. Neither of these arguments shows impairment to a traditional, as opposed to a transformative market.[5] *See* Leval, *supra*, at 1125 (explaining that "[t]he fourth factor disfavors a finding of fair use only when the market is impaired because the ... material serves the consumer as a substitute, or, ... supersedes the use of the original") (internal quotation marks omitted).

Here, unlike in *Texaco*, we hold that DK's use of BGA's images is transformatively different from their original expressive purpose.[6] In a case such as this, a

5. To the contrary, had the book been commercially successful—which it was not—it might have garnered interest in the original images in full size because the reduced images have such minimal expressive impact. An afficionado might seek more than a "peek."

6. *Texaco* may also be distinguished because in that case we found that scientific researchers' copying of scientific journal articles caused those journals to lose license revenues, because the researchers were looking to their own copies of the articles rather than downloading them from online databases such as Lexis, which paid the journals a license fee. *See* 60 F.3d at 929–32. In other words, *Texaco* involved direct evidence that the allegedly infringing use would cause the owner to lose license revenues derived from a substantially similar use.

copyright holder cannot prevent others from entering fair use markets merely "by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work." *Castle Rock*, 150 F.3d at 146 n. 11. "[C]opyright owners may not preempt exploitation of transformative markets ...." *Id.* Moreover, a publisher's willingness to pay license fees for reproduction of images does not establish that the publisher may not, in the alternative, make fair use of those images. *Campbell*, 510 U.S. at 585 n. 18, 114 S.Ct. 1164 (stating that "being denied permission to use [or pay license fees for] a work does not weigh against a finding of fair use"). Since DK's use of BGA's images falls within a transformative market, BGA does not suffer market harm due to the loss of license fees.

## V. Balance of Factors

■ On balance, we conclude, as the district court did, that the fair use factors weigh in favor of DK's use. For the first factor, we conclude that DK's use of concert posters and tickets as historical artifacts of Grateful Dead performances is transformatively different from the original expressive purpose of BGA's copyrighted images. While the second factor favors BGA because of the creative nature of the images, its weight is limited because DK did not exploit the expressive value of the images. Although BGA's images are copied in their entirety, the third factor does not weigh against fair use because the reduced size of the images is consistent with the author's transformative purpose.

Here, in contrast, BGA's direct evidence of its license revenues involves a use that is markedly different from the use by DK. The licenses BGA sold to other publishers were for substantially less transformative uses of its posters: full-page, prominently displayed reproductions of BGA's images, with little discussion of the images or their historical context, much less any compilation of other

Finally, we conclude that DK's use does not harm the market for BGA's sale of its copyrighted artwork, and we do not find market harm based on BGA's hypothetical loss of license revenue from DK's transformative market.

## CONCLUSION

For the foregoing reasons, we conclude that DK's use of BGA's copyrighted images in its book *Illustrated Trip* is fair use. Accordingly, we AFFIRM.

related works into a coherent whole. Indeed, one of the images BGA points to was used as the cover of a book. DK's use of BGA's images is markedly more original than the other uses that BGA has licensed and BGA thus has not shown direct evidence of significant lost license revenue from the uses at issue here.