Reversed and remanded in part; affirmed in part by published opinion. Judge MICHAEL wrote the opinion, in which Judge GREGORY joined. Judge NIEMEYER wrote a dissenting opinion.
OPINION
MICHAEL, Circuit Judge:
For the fourth time we consider on appeal an aspect of Frederick E. Bouchat’s *306 copyright infringement cause against the Baltimore Ravens football organization and National Football League entities for their unauthorized copying of a Ravens team logo, drawn by Bouchat, that was used for three seasons as the team’s official symbol. This appeal arises from an action Bouchat filed to enjoin defendants’ depictions of the copyrighted logo in season highlight films and in the Ravens corporate lobby. The district court found that defendants’ depictions of the logo were a fair use and entered judgment against Bouchat. We reverse in part because defendants cannot establish a fair use defense for the depictions of the logo in the highlight films, where the logo use is non-transformative and commercial. We reject defendants’ contention that Bouc-hat’s request for injunctive relief against these acts of infringement is precluded, and the district court on remand will therefore consider whether an injunction is appropriate. We affirm the district court’s finding of fair use as to the depictions of the logo in the Ravens corporate lobby, where team history is portrayed, free of charge.
I.
Bouchat owns the copyright in a drawing he created in 1995 and proposed for use as the Ravens team logo (the Shield logo). The Ravens used a strikingly similar logo design during the team’s first three seasons, 1996, 1997, and 1998 (the Flying B logo). The Flying B logo was displayed on the side of the Ravens football helmet, painted on the Ravens field, and printed on flags, hats, tickets, and other assorted objects. Our first decision on this subject affirmed the jury’s liability verdict, which found that the Ravens and the National Football League had infringed Bouchat’s copyright in the Shield logo. Bouchat v. Baltimore Ravens, Inc., 241 F.3d 350 (4th Cir.2000) (.Bouchat I). Our second decision affirmed a jury award of zero damages for the basic infringement. Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514 (4th Cir.2003) (.Bouchat II). Our third decision, stemming from actions Bouchat filed against numerous NFL licensees that used the Flying B logo, affirmed judgments “in favor of the licensees because Bouchat [wa]s precluded from obtaining actual damages against them.” Bouchat v. Bon-Ton Dep’t Stores, Inc., 506 F.3d 315, 328 (4th Cir. 2007) (Bouchat III).
This appeal arises from an action brought by Bouchat on February 14, 2008, against the Baltimore Ravens Limited Partnership (the Ravens), the National Football League and NFL Productions LLC (together, the NFL), and The Baltimore Sun Company.[1] Bouchat seeks an injunction prohibiting all current uses of the Flying B logo and requiring the destruction of all items exhibiting the Flying B logo.
The Ravens and the NFL currently display or otherwise make some use of the Flying B logo. The NFL offers for public sale Ravens highlight films of the 1996, 1997, and 1998 seasons. They are sold for fifty dollars each. The films were shot during and produced shortly after each season, and they have not been edited since their first release for sale. The Ravens organization also plays a short highlight film from the 1996 season on its large video screen during home games.
The highlight films contain actual game footage, edited with slow motion effects, *307 musical scores, and a narration. The Flying B logo is displayed in the films just as it was during each game: the logo appears primarily on the helmets of the Ravens players. The logo also appears in other NFL team highlight films from the 1996, 1997, and 1998 seasons for those teams that played against the Ravens in that period. In the 1996 and 1997 Ravens season highlight films, the Flying B logo is prominently displayed as the introductory graphic. In the 1997 film the Flying B logo is displayed on a flag used as a backdrop for an interview, and the logo appears as a graphic next to the name of the interviewee.
The Flying B logo also appears in the lobby of the Ravens headquarters in Ow-ings Mills, Maryland. The lobby is open to anyone entering the building. On one wall is a collage depicting the Ravens history, captioned “Ravens History Begins.” Photos of the team’s first ever first-round NFL draft picks, Jonathan Ogden and Ray Lewis, are prominently displayed in the collage. The photo of each man is from a Ravens football game, and their helmets display the Flying B logo. A glass cabinet in the lobby displays a sheet of Ravens football tickets from the 1996 inaugural season. The Flying B logo is displayed prominently on each ticket.
Absent a valid defense of fair use, defendants’ current depictions of the Flying B logo would violate Bouchat’s copyright in the Shield logo. At a hearing before the district court on August 13, 2008, the parties agreed to submit the case to the court for a bench trial on the merits of defendants’ fair use defense. On November 21, 2008, the district court issued a decision determining that all of defendants’ depictions of Bouchat’s copyright constituted fair use. Judgment was entered in favor of the Ravens and the NFL that same day. Bouchat appeals this final order, challenging the fair use determination. The Ravens and the NFL cross-appeal, asserting that Bouchat’s claim is precluded.
II.
The fair use defense presents a mixed question of law and fact. Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). In this arena we review the district court’s legal conclusions de novo and its findings of fact for clear error. Sundeman v. Seajay Soc’y, Inc., 142 F.3d 194, 201 (4th Cir.1998). However, when “the district court has found facts sufficient to evaluate each of the statutory [fair use] factors, an appellate court need not remand for further factfinding but may conclude as a matter of law that the challenged use does not qualify as a fair use of the copyrighted work.” Harper & Row, 471 U.S. at 560, 105 S.Ct. 2218 (quotations omitted). The district court’s factfinding is not challenged in this appeal.
Section 106 of the Copyright Act grants “a bundle of exclusive rights to the owner of the copyright,” including the rights “to publish, copy, and distribute the author’s work.” Harper & Row, 471 U.S. at 546-47, 105 S.Ct. 2218. These rights, however, are “subject to a list of statutory exceptions, including the exception for fair use provided in 17 U.S.C. § 107.” Bond v. Blum, 317 F.3d 385, 393 (4th Cir.2003). Fair use is a complete defense to infringement. In other words, “the fair use of a copyrighted work ... is not an infringement of copyright.” 17 U.S.C. § 107.
 Fair use was a creature of the common law until 1976 when the doctrine was codified in § 107 of the Copyright Act. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 576, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). “Congress meant § 107 to restate the present judicial doc *308 trine of fair use ... and intended that the courts continue the common-law tradition of fair use adjudication.” Id. at 577, 114 S.Ct. 1164 (quotations omitted). Accordingly, the doctrine of fair use continues to be applied as “an equitable rule of reason, for which no generally applicable definition is possible.” Sundeman, 142 F.3d at 202 (quotations omitted). The fair use inquiry is “not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis.” Campbell, 510 U.S. at 577, 114 S.Ct. 1164. Nevertheless, it is appropriate to use the four statutory factors listed in § 107 “[t]o guide the determination of whether a particular use is a fair use.” Bond, 317 F.3d at 394. The four factors are as follows:
(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.
We will proceed to measure each use of the Flying B logo by defendants against § 107’s four factors. We will, of course, keep in mind that the factors are not to be “treated in isolation,” but rather “the results [are to be] weighed together, in light of the purposes of copyright.” Campbell, 510 U.S. at 578, 114 S.Ct. 1164.
III.
A.
Defendants’ first use of the Flying B logo that we analyze is its depiction in the season highlight films sold by the NFL and the highlight film played during the Ravens home football games.
1.
Under § 107’s first factor we consider “the purpose and character of [defendants’] use [of the Flying B logo], including whether such use is of a commercial nature or is for nonprofit educational purposes.” 17 U.S.C. § 107(1). This inquiry “may be guided by the [fair use] examples given in the preamble to § 107,” Campbell, 510 U.S. at 578,114 S.Ct. 1164, specifically, “criticism, comment, news reporting, teaching ... scholarship, or research,” 17 U.S.C. § 107. The 1996 highlight film played by the Ravens during home football games is part of an entertainment package included in the price of tickets to the games. The longer season highlight films for 1996, 1997, and 1998 are also objects of entertainment, marketed and sold to the public on the NFL’s website for fifty dollars. The core commercial purpose of the highlight films does not align with the preamble’s protected purposes of comment, news reporting, research, and the like.
 Of course, the preamble is not meant to be an exhaustive list of fair use examples. See Harper & Row, 471 U.S. at 561, 105 S.Ct. 2218. To help determine what else might count, we ask “whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message; [we] ask[ ], in other words, whether and to what extent the new work is trans-formative.” Campbell, 510 U.S. at 579, 114 S.Ct. 1164 (citing Pierre N. Leval, Commentary, Toward a Fair Use Standard, 103 Harv. L.Rev. 1105, 1111 (1990) (Leval)) (quotations omitted). “A ‘trans-formative’ use is one that ‘employ[s] the [copyrighted work] in a different manner or for a different purpose from the origi *309 nal,’ thus transforming it.” Vanderhye v. iParadigms, LLC, 562 F.3d 630, 638 (4th Cir.2009) (quoting Leval, supra).
A logo is an identifying symbol. The Flying B logo was designed and used as a symbol identifying whatever or whomever it adorned with the Baltimore Ravens football organization. A football player wearing a helmet with the Flying B logo is readily identified as a football player for the Ravens. The stadium field painted with the Flying B logo identifies it as the home field of the Ravens football team.
There is no transformative purpose behind the depiction of the Flying B logo in the highlight films. The use of the logo in the films serves the same purpose that it did when defendants first infringed Bouc-hat’s copyrighted Shield logo design: the Flying B logo identifies the football player wearing it with the Baltimore Ravens. The simple act of filming the game in which the copyrighted work was displayed did not “add[ ] something new” to the logo. Campbell, 510 U.S. at 579, 114 S.Ct. 1164. It did not “alter[] the [logo] with new expression, meaning or message.” Id. The films capture the logo as it originally appeared, and the logo remains a symbol identifying the Ravens.
We disagree with the district court’s conclusion that the purpose behind the use of the Flying B logo in the highlight films was “primarily historical.” J.A. 56. While the films no doubt add to the historical record of Ravens play, the use of the logo in those films simply fulfilled its purpose of identifying the team. The logo continues to fulfill that purpose whenever a highlight film is shown. Two hypothetical circumstances illustrate our point. In the first, an individual at home in her living room in 1996 watches a Ravens football game on television. The Flying B logo on the helmets of one team helps her identify the team as the Ravens. In the second, an individual at home today (2010) in his living room watches the 1996 Ravens season highlight film. The Flying B logo on the helmets of one team helps him identify the team as the Ravens. The logo plays the same role in each example. Its purpose is not transformed in the highlight film, viewed some fourteen years later.
Simply filming football games that include the copyrighted logo does not transform the purpose behind the logo’s use into a historical one. Defendants point to the dramatic editing, music, and narration in the highlight films in an attempt to show a transformative use for the logo. But none of these effects transform the purpose behind the display of the logo. The narrator in the films never comments on the controversy surrounding the use of the Flying B logo. Nor are the films a documentary on the history of the Ravens logo. Instead, the films simply capture highlights of three Ravens seasons and necessarily portray the Flying B logo as it was actually used — to identify the Ravens team.
Merely labeling a use as historical does not create a presumption of fair use. Even the six uses specifically listed in the preamble to § 107 do not create presumptive categories of fair use protection. A transformative purpose is also required. See Harper & Row, 471 U.S. at 561, 105 S.Ct. 2218 (“This listing was not intended ... to single out any particular use as presumptively a ‘fair’ use.”). For example, the use of a copyrighted work in news reporting (a use listed in § 107’s preamble) must still be analyzed to determine if the purpose behind the use is transformative. See id. (“The issue is not what constitutes ‘news,’ but whether a claim of newsreporting is a valid fair use defense to an infringement of copyrightable expression.”) (quotations and emphasis removed). Again, a transformative purpose involves a *310 use of the copyrighted work “in a different manner or for a different purpose from the original.” Vanderhye, 562 F.3d at 638 (quoting Leval, supra, at 1111). The historical use analysis employed by the district court was fundamentally flawed because it did not sufficiently confront whether the challenged use had a transfor-mative purpose.
The district court erred in minimizing the display of the Flying B logo as “incidental to the primary [historical] purpose [of the films].” J.A. 55. The proper inquiry relates to whether there is a transfor-mative purpose behind the use, and “a taking may not be excused merely because it is insubstantial with respect to the infringing work.” Harper & Row, 471 U.S. at 565, 105 S.Ct. 2218 (emphasis in original). Again, because the logo is still being used as a logo, that is, as an identifying symbol of the Ravens, the purpose behind the use is not transformative.
Three cases from the Second Circuit suggest that the purpose and character of the use here weigh against a finding of fair use in the highlight films. First, in Ringgold v. Black Entertainment Television, Inc., 126 F.3d 70 (2d Cir.1997), the Second Circuit found that the display of a poster of a copyrighted artwork as a set decoration for a television show did not constitute fair use, even though the show was creative and the copyrighted work was visible for a total of only 26.75 seconds. According to the court, the purpose and character of the use weighed against a finding of fair use because the defendants “used [the artist’s] work for precisely a central purpose for which it was created — to be decorative.” Id. at 79. Second, in Davis v. The Gap, Inc., 246 F.3d 152, 156 (2d Cir.2001), copyrighted decorative eyewear (specifically, “nonfunctional jewelry worn ... in the manner of eyeglasses”) was used by The Gap clothing company in one of its print advertisements. The Second Circuit found that the use was not a fair use and weighed the first factor against The Gap. The court “f[ou]nd nothing transformative about the Gap’s presentation of [the] copyrighted work” because “[t]he ad shows [the decorative eyewear] being worn as eye jewelry in the manner it was made to be worn.” Id. at 174. Third, in Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605 (2d Cir.2006), a rock band’s copyrighted concert posters were reproduced in a biography of the band. The posters were shown in reduced size on an illustrated timeline of the band’s history. The Second Circuit found the use of the posters to be “transformatively different.” Id. at 609. The original purpose of the posters was to advertise “the band’s forthcoming concerts,” while the transformative purpose of the posters in the biography was “to document and represent the actual occurrence of [the] concert events featured on [the biography’s] timeline.” Id.
Here, just as in Ringgold and Davis, there is nothing transformative in the use of the Flying B logo in the season highlight films. The Flying B Logo remains a logo used to identify the Ravens, just like the decorative poster in Ringgold remained a decorative poster, and just like the decorative eyewear in Davis remained decorative eyewear worn as nonfunctional jewelry. Unlike in Bill Graham Archives, where the concert posters were put to transformative use (and no longer served the original advertising purpose), the logo here continues to identify the Ravens, as it did originally.
Consideration of the purpose and character of the use includes an examination of “whether [the] use is of a commercial nature or is for nonprofit educational purpose.” 17 U.S.C. § 107(1). Here, the commercial purpose behind the season highlight films “ ‘tends to weigh against a *311 finding’ that the challenged use is a ‘fair use.’ ” Bond, 317 F.3d at 395 (quoting Harper & Row, 471 U.S. at 562, 105 S.Ct. 2218). “The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.” Harper & Row, 471 U.S. at 562, 105 S.Ct. 2218.
It is customary for NFL teams to license their copyrighted logos for use in any number of commercial products. See Bouchat III, 506 F.3d at 325. Of course, Bouchat did not receive the customary price for the use of his copyrighted logo in the highlight films. Because defendants’ use of Bouchat’s logo is non-transforma-tive, we have no hesitation in concluding that the commercial nature of the use weighs against a finding of fair use. Cf. Campbell, 510 U.S. at 579, 114 S.Ct. 1164 (“[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.”).
Finally, because the codified fair use doctrine remains an “equitable rule of reason,” Sundeman, 142 F.3d at 202, “the propriety of the defendants’] conduct” is “relevant to the ‘character’ of the use,” Harper & Row, 471 U.S. at 562, 105 S.Ct. 2218 (quotations omitted). The Ravens and the NFL are not innocent third parties documenting the history of the Ravens or the Ravens logo. Instead, defendants were responsible for the original copyright infringement, the use of the Flying B as the Ravens logo. Defendants cannot assert that it is a fair use to profit from that very same copyright infringement when the purpose of the use is not transformed.
In sum, the purpose and the character of the use of the Flying B logo weighs against a finding of fair use in the depiction of the logo in the highlight films.
2.
The second statutory factor directs us to consider “the nature of the copyrighted work.” 17 U.S.C. § 107(2). The copyrighted work here is a creative drawing, and “[creative works ... are closer to the core of works protected by the Copyright Act.” Sundeman, 142 F.3d at 204. We agree with the district court that the creative nature of Bouchat’s work “would ... tend to indicate that making a copy would not be fair use.” J.A. 56. This factor weighs against a finding of fair use of the Flying B logo in the highlight films.
3.
The third factor directs us to consider “the amount and substantiality of the portion used in relation to the copyrighted work as a whole.” 17 U.S.C. § 107(3). “Copying an entire work weighs against finding a fair use.” Sundeman, 142 F.3d at 205.
Bouchat’s entire work is reproduced in the highlight films. The “ordinary effect” of “the fact that the entire work is reproduced ... militat[es] against a finding of fair use.” Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 449-50, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Of course, the inquiry “harken[s] back to the first of the statutory factors, for ... we recognize that the extent of permissible copying varies with the purpose and character of the use.” Campbell, 510 U.S. at 586-87, 114 S.Ct. 1164. Unless the use is transformative, the use of a copyrighted work in its entirety will normally weigh against a finding of fair use.
The district court weighed the third factor in favor of finding a fair use because “the Flying B logo, although depicted in its entirety, is not a major component of the *312 entire work in which it is used.” J.A. 57. In other words, “the copyright protected work is only an inconsequential portion of the overall work.” Id. This conclusion was error because “a taking may not be excused merely because it is insubstantial with respect to the infringing work,” for “no plagiarist can excuse the wrong by showing how much of his work he did not pirate.” Harper & Row, 471 U.S. at 565, 105 S.Ct. 2218 (quotations omitted) (emphasis in original). What matters is the amount of the copyrighted work used. Here, Bouchat’s entire work was copied.
We consequently weigh the third factor against a finding of fair use.
4.
The fourth factor directs us to consider “the effect of the use upon the potential market for or value of the copyrighted work.” 17 U.S.C. § 107. “This last factor is undoubtedly the single most important element of fair use.” Harper & Row, 471 U.S. at 566, 105 S.Ct. 2218. We “consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original.” Campbell, 510 U.S. at 590, 114 S.Ct. 1164 (quotations omitted). In other words, “to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work.” Harper & Row, 471 U.S. at 568, 105 S.Ct. 2218 (quotations omitted) (emphasis in original).
We note first that, in pressing their affirmative defense, the Ravens and the NFL “have difficulty carrying the burden of demonstrating fair use without favorable evidence” about a potential market, especially since the entire copyrighted work is used without a transformative purpose. Campbell, 510 U.S. at 590-91, 114 S.Ct. 1164. The Ravens and the NFL did not submit any evidence to the district court about potential markets.
Despite their lack of evidence about potential markets, defendants argue that the fourth factor (market effect) weighs in favor of fair use because “[a] jury has already determined ... that none of Defendants’ profits from their active use of the Flying B logo in merchandise was attributable to Bouchat’s work.” Br. for Defendants-Appellees at 27 (citing Bouchat II, 346 F.3d at 519). However, a finding that none of defendants’ profits derived from the Flying B logo has no bearing on “the potential market for or value of the copyrighted work.” 17 U.S.C. § 107(4). If a football team decides that it needs a logo, it can either design one itself or hire a graphic artist to design one. A market does not fail to exist for the product of the designer’s services (here, the logo) simply because the football team’s profits do not ultimately derive from the use of that logo.
The existence of a market for Bouehat’s product is entirely consistent with the earlier jury finding. We affirmed the jury determination of zero damages despite the fact that the Ravens and the NFL “derive revenues from ... royalties from licensees who sell official team merchandise.” Bouchat II, 346 F.3d at 523. The licensing of NFL logos for use in the sale of official team merchandise, in exchange for royalties, is exactly the type of potential market that exists for Bouchat’s copyrighted logo. Indeed, Bouchat could have pursued actual damages against the licensees of the Flying B logo if we had not concluded that he was barred by claim preclusion. Preclusion was triggered because Bouchat sued the Ravens and the NFL first in Bouchat *313 I, where he did not pursue actual damages. See Bouchat III, 506 F.3d at 326-29.
In fact, we know that there was a market for Bouchat’s copyrighted logo when the Ravens used the Flying B logo for the 1996, 1997, and 1998 seasons. In 1996 the NFL granted “licenses and other forms of permission” allowing the Flying B logo to be “used by hundreds of manufacturers, distributors, sponsors, etc. in connection with their respective business operations.” Bouchat v. Champion Products, Inc., 327 F.Supp.2d 537, 540 (D.Md.2003). Defendants did not offer evidence to show that this licensing market no longer exists, and we conclude that there is a potential market for Bouchat’s copyrighted work. The NFL sells on its website a number of consumer products that are decorated with historic logos from various NFL teams and marketed as “throwback” merchandise. In light of the market in licensing historic logos, defendants’ unrestricted use of the infringing Flying B logo “would result in a substantially adverse impact on the potential market for [Bouchat’s] original” logo. Campbell, 510 U.S. at 590, 114 S.Ct. 1164 (quotations omitted).
When a use is not transformative, market substitution is more likely. Cf. Campbell, 510 U.S. at 591, 114 S.Ct. 1164 (“[W]hen ... the second use is transfor-mative, market substitution is at least less certain.”); see also Vanderhye, 562 F.3d at 643 (“[T]he transformative nature of the use is relevant to the market effect factor.”). Moreover, “when a commercial use amounts to mere duplication of the entirety of an original it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur.” Campbell, 510 U.S. at 591, 114 S.Ct. 1164 (quotations omitted). We have already found that defendants’ use of the Flying B logo in the highlight films is not transformative and that the logo is used for a commercial purpose. These findings, and defendants’ failure to show the lack of a market, require us to weigh the fourth factor against a finding of fair use.
5.
We have considered each of the four statutory factors separately and found that each one goes against a finding of fair use. The codified fair use doctrine is applied as “an equitable rule of reason,” Sundeman, 142 F.3d at 202, which means that the results of every factor’s analysis are weighed together in determining whether there is fair use, Campbell, 510 U.S. at 578, 114 S.Ct. 1164. After weighing together the results from the analyses of the four factors, we easily conclude that the use of the Flying B logo in the highlight films is not a fair use. The Ravens and the NFL originally violated Bouchat’s copyright by using his logo as the Ravens logo. Highlight films that come along later and depict that same use, without transformation, cannot stand as a fair use. Therefore, the depiction of the Flying B logo in the season highlight films sold by the NFL and the highlight film played during the Ravens home football games is an infringement of Bouchat’s copyright.
B.
Next, we analyze the depictions of the Flying B logo in the lobby of the Ravens corporate headquarters, again using § 107’s four factors.
1.
As we said above, evaluation of § 107’s first factor — purpose and character of the use — may be guided by the fair use examples mentioned in § 107’s preamble. Supra at 308. The lobby of the Ravens headquarters has an area that is dedicated *314 to the history of the team. The use of a copyrighted work in a museum-like setting is akin to the fair use of a work for “teaching ..., scholarship, or research,” fair uses listed in the preamble to § 107. 17 U.S.C. § 107. The Flying B logo is displayed in the Ravens lobby on actual game tickets from the inaugural season and in two large photos of the team’s first ever first-round draft picks. These depictions of the logo are consistent with the fair use display of copyrighted material in a museum.
Most important, the use of the logo in a museum-like setting “adds something new” to its. original purpose as a symbol identifying the Ravens. Campbell, 510 U.S. at 579, 114 S.Ct. 1164. The season tickets and the player photos adorned with the Flying B logo are displayed to represent the inaugural season and the team’s first draft picks. In this way, the logo is used “not for its expressive content, but rather for its ... factual content.” Bond, 317 F.3d at 396. This use is comparable to the use of the concert posters in Bill Graham Archives, 448 F.3d at 609, where the posters documented the fact of past concerts, a transformatively different purpose from their original use as advertisements for future concerts.
Finally, unlike in the highlight films, there is no clear-cut commercial purpose behind the use of the logo in the Ravens lobby. The lobby is open to the public, free of charge. “If a challenged use of a copyrighted work is noncommercial, the party alleging infringement must demonstrate ‘either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work.’ ” Bond, 317 F.3d at 395 (quoting Sony, 464 U.S. at 451, 104 S.Ct. 774). Bouchat presented no evidence as to how the lobby depictions have harmed or might harm his market, and the apparent noncommercial nature of the lobby use therefore “weighs heavily against [his] infringement claim” with respect to that use. Id.
“[I]t is appropriate to evaluate [the use’s] commercial status on its own terms.” 4-13 David Nimmer & Melville, Nimmer on Copyright § 13.05[A][l][c]. Here, the Ravens were “not gaining direct or immediate commercial advantage from” the depictions of the logo in the lobby “ — i.e., [the team’s] profits, revenues, and overall commercial performance were not tied to” this use. Am. Geophysical Union v. Texaco, Inc., 60 F.3d 913, 921 (2d Cir.1994). At bottom, we find no commercial use because no fee is charged to view the displays in the lobby of the Ravens corporate headquarters.
Although the Ravens remain responsible for the original act of infringement, the noncommercial purpose and character of the use in the lobby works in favor of a finding of fair use there. On the other hand, the character of the use in the highlight films is particularly indefensible because the Ravens and the NFL are exploiting to their commercial advantage their original infringements. In the lobby, however, the Ravens are displaying their team history without any direct or immediate financial remuneration.
Because there is a transformative, noncommercial purpose behind the depiction of the Flying B logo in the Ravens lobby, we weigh the first factor — purpose and character of the use — in favor of fair use.
2.
With respect to the use of the Flying B logo in the lobby, we agree with the district court that the second statutory fair use factor, “the nature of the copyrighted work,” 17 U.S.C. § 107(2), tends to weigh against a finding of fair use, see Campbell, 510 U.S. at 586, 114 S.Ct. 1164. However, as the Supreme Court has ex *315 plained, the second factor “is not much help” in deciding whether the “copy[ing] [of] publicly known, expressive works” is fair use. Id. More particularly, “the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose.” Bill Graham Archives, 448 F.3d at 612. As mentioned above, the transformative purpose of the lobby use was to display a set of inaugural season tickets and photographs of the team’s first ever draft picks, all picturing the Flying B logo in use at the time. Even in this transformative use, however, the logo’s creative expression is still apparent. Although we do not assign much weight to “the nature of the copyrighted work” factor, the durability of the copied logo’s creative expression leads us to conclude that this factor tilts slightly against a finding of fair use.
3.
The third statutory fair use factor is “the amount and substantiality of the portion used in relation to the copyrighted work as a whole.” 17 U.S.C. § 107(3). The fact that Bouchat’s entire work (in the form of the Flying B logo) is reproduced in the displays in the lobby “militat[es] against a finding of fair use.” Sony, 464 U.S. at 449-50, 104 S.Ct. 774. However, “it does not preclude a finding of fair use,” Sundeman, 142 F.3d at 205, because “the extent of permissible copying varies with the purpose and character of the use,” Campbell, 510 U.S. at 586-87, 114 S.Ct. 1164.
Here, “when the extent of the copying is considered with the purpose and character of the uses, the amount and substance of the copies are justified.” Sundeman, 142 F.3d at 206. The Ravens have no choice but to use the entire copyrighted work if they wish to display the inaugural season tickets and the photographs of their first ever draft picks in their original team dress. The tickets were originally printed with the entire logo, and the players dressed with the entire logo on their helmets. Therefore, in order to fulfill the legitimate transformative purpose of exhibiting the Ravens inaugural season tickets and the photos of the team’s first ever draft picks, the entire work has to be displayed.
The third factor, when applied to the uses of the logo in the lobby, does not weigh against a finding of fair use because the amount copied is justified in relation to the transformative purpose behind the use. However, because the entire work is displayed, we decline to weigh the third factor in favor of fair use. The third factor is neutral.
4.
The fourth statutory fair use factor is “the effect of the use upon the potential market for or value of the copyrighted work.” 17 U.S.C. § 107(4). Earlier, in considering the highlight films, we weighed this factor against a finding of fair use because the use was both nontransformative and commercial. The use of the logo in the Ravens lobby, however, is both transformative and noncommercial. When the “use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred.” Campbell, 510 U.S. at 591, 114 S.Ct. 1164. Moreover, when the use “is for a noncommercial purpose, the likelihood [of future market harm] must be demonstrated” by the copyright holder. Sony, 464 U.S. at 451, 104 S.Ct. 774. Bouchat offered no evidence of market harm as a result of the lobby displays. The transformative and noncommercial use in the lobby and the lack of evidence about market harm leads us to weigh the market effect factor in favor of a finding of fair use.
*316 5.
The first (purpose and character of the use) and fourth (effect of use upon the market) factors weigh in favor of a finding of fair use, the second factor (nature of the copyrighted work) weighs only slightly against, and the third factor (extent of the use) is neutral. Considering the § 107 factors together, we find that the use of the Flying B logo in the Ravens lobby is a fair use. The transformative, noncommercial uses documenting (by ticket display) the inaugural season games and portraying (in team uniform) the Ravens first ever draft picks are fair uses. Therefore, the current depictions of the Flying B logo in the Ravens lobby are not infringements.
IV.
Because the depiction of the Flying B logo in the highlight films is an infringement of Bouchat’s copyrighted work, we must consider the Ravens and the NFL’s alternative argument for affir-mance. Defendants argue that Bouchat’s pending suit against them seeking injunc-tive relief against current infringement is barred by claim preclusion: in Bouchat I, an infringement suit for damages that proceeded to judgment, Bouchat did not seek, but could have sought, to enjoin defendants from using the Flying B logo. Here, the district court did not reach the preclusion issue because the court awarded judgment to defendants based on the defense of fair use. However, the district court “notefd] that [it] does not agree with Defendants that Bouchat would be procedurally prevented from obtaining [injunctive] relief ... if the Defendants’ use of the Flying B Logo were not held to be fair use under the Copyright Act.” J.A. 52 n. 10.
A three-element test, which we applied in Bouchat III, governs whether Bouchat’s claim for injunctive relief in this case is barred by principles of preclusion: “A subsequent claim is precluded when (1) the judgment in the prior action was final and on the merits; (2) the parties in the two actions are identical or in privity; and (3) the claims in the two actions are identical.” 506 F.3d at 326-27. Defendants satisfy the first two elements without dispute. They do not satisfy the third element, however.
Bouchat’s infringement claim for injunctive relief in this case is not identical to his earlier claim. “Each act of infringement is a distinct harm giving rise to an independent claim for relief.” Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199, 204 (4th Cir.1997) (quoting Stone v. Williams, 970 F.2d 1043, 1049 (2d Cir.1992)); see also Meekins v. United Transp. Union, 946 F.2d 1054, 1058 (4th Cir.1991) (“Res judicata has very little applicability to a fact situation involving a continuing series of acts, for generally each act gives rise to new cause of action.”) (quotations omitted). The earlier claim sought damages for infringements that took place prior to final judgment, issued on July 26, 2002. Bouchat II, 346 F.3d at 519. Bouchat now seeks an injunction against present infringements of his copyrighted work. These infringements “giv[e] rise to an independent claim for relief’ and are therefore not identical to the earlier claim for purposes of preclusion. Hotaling, 118 F.3d at 204.
In Bouchat III we held that Bouchat was precluded from bringing claims for damages against licensees that used the infringing logos in various endeavors, including the production and marketing of official Ravens merchandise. Bouchat’s suits against the licensees involved the very same acts of infringement at issue in his earlier suit against the licensors. 506 F.3d at 327-28 (“While [the first suit] fo *317 cused on the licensor[s’]- conduct, and [the subsequent suits] shift the focus to the licensees’ conduct, the same violations of Bouchat’s copyright are described throughout all of the complaints.”). In other words, the acts of infringement by the licensees were the flip side of the same coin whose other side showed the same acts of infringement by the licensors. Here, on the other hand, Bouchat is asserting a claim to enjoin different acts of infringement, namely, the present acts of infringement by the Ravens and the NFL, including the use of the logo in the highlight films. This action is not barred by claim preclusion.
V.
We reverse in part because the Ravens and the NFL did not establish fair use of the Flying B logo in the highlight films sold by the NFL and the highlight film played during the Ravens home football games. The films infringe on Bouchat’s copyrighted work, and his request for in-junctive relief against this infringement is not precluded. On remand the district court will consider whether an injunction is appropriate.[2] We affirm the district court’s determination of fair use of the Flying B logo on the items displayed in the Ravens corporate lobby.

REVERSED AND REMANDED IN PART; AFFIRMED IN PART

. The Baltimore Sun Company was dismissed with prejudice on August 12, 2008, at Bouc-hat’s request.

. The dissent (part IV), ignoring Supreme Court guidance, would deny injunctive relief to Bouchat without permitting the district court to decide in the first place whether to grant or deny that relief. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) ("[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts.”). In eBay the Supreme Court was careful to "take no position on whether permanent injunctive relief should or should not issue in th[at] ... case.” Id. It "vacatefd] the judgment of the Court of Appeals, so that the District Court [could] apply [the governing] framework in the first instance.” Id.