Justice Ginsburg,
with whom Justice Kennedy joins, and with whom Justice Scalia joins except as to Parts III and V-B-1, dissenting.
“In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress.” United States v. American Trucking Assns., Inc., 310 U. S. 534, 542 (1940). Instead of adhering to the Legislature’s design, the Court today adopts an interpretation of the Copyright Act at odds with Congress’ aim to protect copyright owners against the unauthorized importation of low-priced, foreign-made copies of their copyrighted works. The Court’s bold departure from Congress’ design is all the more stunning, for it places the United States at the vanguard of the movement for “international exhaustion” of copyrights—a movement the United States has steadfastly resisted on the world stage.
To justify a holding that shrinks to insignificance copyright protection against the unauthorized importation of foreign-made copies, the Court identifies several “practical problems.” Ante, at 545. The Court’s parade of horribles, however, is largely imaginary. Congress’ objective in enacting 17 U. S. C. § 602(a)(1)’s importation prohibition can be honored without generating the absurd consequences hypothesized in the Court’s opinion. I dissent from the Court’s embrace of “international exhaustion,” and would affirm the sound judgment of the Court of Appeals.
I
Because economic conditions and demand for particular goods vary across the globe, copyright owners have a financial incentive to charge different prices for copies of their works in different geographic regions. Their ability to engage in such price discrimination, however, is undermined if *558 arbitrageurs are permitted to import copies from low-price regions and sell them in high-price regions. The question in this case is whether the unauthorized importation of foreign-made copies constitutes copyright infringement under U. S. law.
To answer this question, one must examine three provisions of Title 17 of the U. S. Code: §§106(3), 109(a), and 602(a)(1). Section 106 sets forth the “exclusive rights” of a copyright owner, including the right “to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.” § 106(3). This distribution right is limited by § 109(a), which provides: “Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title ... is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.” Section 109(a) codifies the “first sale doctrine,” a doctrine articulated in Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 349-351 (1908), which held that a copyright owner could not control the price at which retailers sold lawfully purchased copies of its work. The first sale doctrine recognizes that a copyright owner should not be permitted to exercise perpetual control over the distribution of copies of a copyrighted work. At some point—ordinarily the time of the first commercial sale—the copyright owner’s exclusive right under § 106(3) to control the distribution of a particular copy is exhausted, and from that point forward, the copy can be resold or otherwise redistributed without the copyright owner’s authorization.
Section 602(a)(1) (2006 ed., Supp. V)[1]—last, but most critical, of the three copyright provisions bearing on this case— is an importation ban. It reads:
*559 “Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501.”
In Quality King Distributors, Inc. v. L’anza Research Int’l, Inc., 523 U. S. 135, 143-154 (1998), the Court held that a copyright owner’s right to control importation under § 602(a)(1) is a component of the distribution right set forth in § 106(3) and is therefore subject to § 109(a)’s codification of the first sale doctrine. Quality King thus held that the importation of copies made in the United States but sold abroad did not rank as copyright infringement under § 602(a)(1). Id., at 143-154. See also id., at 154 (Ginsburg, J., concurring) (Quality King “involve[d] a ‘round trip’ journey, travel of the copies in question from the United States to places abroad, then back again”).[2] Important to the Court’s holding, the copies at issue in Quality King had been “‘lawfully made under [Title 17]’”—a prerequisite for application of § 109(a). Id., at 143, n. 9 (quoting § 109(a)). Section 602(a)(1), the Court noted, would apply to “copies that *560 were ‘lawfully made’ not under the United States Copyright Act, but instead, under the law of some other country.” Id., at 147. Drawing on an example discussed during a 1964 public meeting on proposed revisions to the U. S. copyright laws,[3] the Court stated:
“If the author of [a] work gave the exclusive United States distribution rights—enforceable under the Act— to the publisher of the United States edition and the exclusive British distribution rights to the publisher of the British edition, . . . presumably only those [copies] made by the publisher of the United States edition would be ‘lawfully made under this title’ within the meaning of § 109(a). The first sale doctrine would not provide the publisher of the British edition who decided to sell in the American market with a defense to an action under § 602(a) (or, for that matter, to an action under § 106(3), if there was a distribution of the copies).” Id., at 148.
As the District Court and the Court of Appeals concluded, see 654 F. 3d 210, 221-222 (CA2 2011); App. to Pet. for Cert. 70a-73a, application of the Quality King analysis to the facts of this case would preclude any invocation of § 109(a). Petitioner Supap Kirtsaeng imported and then sold at a profit over 600 copies of copyrighted textbooks printed outside the United States by the Asian subsidiary of respondent John Wiley & Sons, Inc. (Wiley). App. 29-34. See also ante, at 525-527 (opinion of the Court). In the words the Court used in Quality King, these copies “were ‘lawfully made’ not under the United States Copyright Act, but instead, under *561 the law of some other country.” 523 U. S., at 147. Section 109(a) therefore does not apply, and Kirtsaeng’s unauthorized importation constitutes copyright infringement under § 602(a)(1).
The Court does not deny that under the language I have quoted from Quality King, Wiley would prevail. Ante, at 548. Nevertheless, the Court dismisses this language, to which all Members of the Quality King Court subscribed, as ill-considered dictum. Ante, at 548. I agree that the discussion was dictum in the sense that it was not essential to the Court's judgment. See Quality King, 523 U. S., at 154 (Ginsburg, J., concurring) (“[W]e do not today resolve eases in which the allegedly infringing imports were manufactured abroad.”). But I disagree with the Court’s conclusion that this dictum was ill considered. Instead, for the reasons explained below, I would hold, consistently with Quality King⅛ dictum, that § 602(a)(1) authorizes a copyright owner to bar the importation of a copy manufactured abroad for sale abroad.
II
The text of the Copyright Act demonstrates that Congress intended to provide copyright owners with a potent remedy against the importation of foreign-made copies of their copyrighted works. As the Court recognizes, ante, at 525, this case turns on the meaning of the phrase “lawfully made under this title” in § 109(a). In my view, that phrase is most sensibly read as referring to instances in which a copy’s creation is governed by, and conducted in compliance with, Title 17 of the U. S. Code. This reading is consistent with the Court’s interpretation of similar language in other statutes. See Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc., 554 U. S. 33, 52-53 (2008) (“under” in 11 U. S. C. § 1146(a), a Bankruptcy Code provision exempting certain asset transfers from stamp taxes, means “pursuant to”); Ardestani v. INS, 502 U. S. 129, 135 (1991) (the phrase “under section 554” in the Equal Access to Justice Act means “subject to” or *562 “governed by” 5 U. S. C. § 554 (internal quotation marks omitted)). It also accords with dictionary definitions of the word “under.” See, e. g., American Heritage Dictionary 1887 (5th ed. 2011) (“under” means, among other things, “[s]ubject to the authority, rule, or control of”).
Section 109(a), properly read, affords Kirtsaeng no defense against Wiley’s claim of copyright infringement. The Copyright Act, it has been observed time and again, does not apply extraterritorially. See United Dictionary Co. v. G. & C. Merriam Co., 208 U. S. 260, 264 (1908) (copyright statute requiring that U. S. copyright notices be placed in all copies of a work did not apply to copies published abroad because U. S. copyright laws have no “force” beyond the United States’ borders); 4 M. Nimmer & D. Nimmer, Copyright § 17.02, p. 17-18 (2012) (hereinafter Nimmer) (“[C]opyright laws do not have any extraterritorial operation.”); 4 W. Patry, Copyright § 13:22, p. 13-66 (2012) (hereinafter Patry) (“Copyright laws are rigorously territorial.”). The printing of Wiley’s foreign-manufactured textbooks therefore was not governed by Title 17. The textbooks thus were not “lawfully made under [Title 17],” the crucial precondition for application of § 109(a). And if § 109(a) does not apply, there is no dispute that Kirtsaeng ⅛ conduct constituted copyright infringement under § 602(a)(1).
The Court’s point of departure is similar to mine. According to the Court, the phrase “ ‘lawfully made under this title’ means made fin accordance with’ or fin compliance with’ the Copyright Act.” Ante, at 530. But the Court overlooks that, according to the very dictionaries it cites, ante, at 531, the word “under” commonly signals a relationship of subjection, where one thing is governed or regulated by another. See Black’s Law Dictionary 1525 (6th ed. 1990) (“under” “frequently” means “inferior” or “subordinate” (internal quotation marks omitted)); 18 Oxford English Dictionary 950 (2d ed. 1989) (“under” means, among other things, “[i]n accordance with (some regulative power or principle)’*, (emphasis added)). *563 See also Webster’s Third New International Dictionary 2487 (1961) (“under” means, among other things, “in ... a condition of subjection, regulation, or subordination” and “suffering restriction, restraint, or control by”). Only by disregarding this established meaning of “under” can the Court arrive at the conclusion that Wiley’s foreign-manufactured textbooks were “lawfully made under” U. S. copyright law, even though that law did not govern their creation. It is anomalous, however, to speak of particular conduct as “lawful” under an inapplicable law. For example, one might say that driving on the right side of the road in England is “lawful” under U. S. law, but that would be so only because U. S. law has nothing to say about the subject. The governing law is English law, and English law demands that driving be done on the left side of the road.[4]
The logical implication of the Court’s definition of the word “under” is that any copy manufactured abroad—even a piratical one made without the copyright owner’s authorization and in violation of the law of the country where it was created—would fall within the scope of § 109(a). Any such copy would have been made “in accordance with” or “in compliance with” the U. S. Copyright Act, in the sense that manufacturing the copy did not violate the Act (because the Act does not apply extraterritorially).
The Court rightly refuses to accept such an absurd conclusion. Instead, it interprets § 109(a) as applying only to cop *564 ies whose making actually complied with Title 17, or would have complied with Title 17 had Title 17 been applicable (i. e., had the copies been made in the United States). See ante, at 530 (“[Section] 109(a)’s ‘first sale’ doctrine would apply to copyrighted works as long as their manufacture met the requirements of American copyright law.”). Congress, however, used express language when it called for such a coun-terfactual inquiry in 17 U. S. C. §§ 602(a)(2) and (b). See § 602(a)(2) (“Importation into the United States or exportation from the United States, without the authority of the owner of copyright under this title, of copies or phonorec-ords, the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if this title had been applicable, is an infringement of the exclusive right to distribute copies or pho-norecords under section 106.” (emphasis added)); § 602(b) (“In a case where the making of the copies or phonorecords would have constituted an infringement of copyright if this title had been applicable, their importation is prohibited.” (emphasis added)). Had Congress intended courts to engage in a similarly hypothetical inquiry under § 109(a), Congress would presumably have included similar language in that section. See Russello v. United States, 464 U. S. 16, 23 (1983) (“‘[WJhere Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.’” (quoting United States v. Wong Kim Bo, 472 F. 2d 720, 722 (CA5 1972) (per curiam); brackets in original)).[5]
*565 Not only does the Court adopt an unnatural construction of the § 109(a) phrase “lawfully made under this title.” Concomitantly, the Court reduces § 602(a)(1) to insignificance. As the Court appears to acknowledge, see ante, at 547, the only independent effect § 602(a)(1) has under today’s decision is to prohibit unauthorized importations carried out by persons who merely have possession of, but do not own, the imported copies. See 17 U. S. C. § 109(a) (§ 109(a) applies to any “owner of a particular copy or phonorecord lawfully made under this title” (emphasis added)).[6] If this is enough to avoid rendering § 602(a)(1) entirely “superfluous,” ante, at 547, it hardly suffices to give the owner’s importation right the scope Congress intended it to have. Congress used *566 broad language in § 602(a)(1); it did so to achieve a broad objective. Had Congress intended simply to provide a copyright remedy against larcenous lessees, licensees, consignees, and bailees of films and other copyright-protected goods, see ante, at 534-635, 547, it likely would have used language tailored to that narrow purpose. See 2 Nimmer § 8.12[B][6][c], at 8-184.31, n. 432 (“It may be wondered whether ... potential causes of action [against licensees and the like] are more than theoretical.”). See also ante, at 555 (Kagan, J., concurring) (the Court’s decision limits § 602(a)(1) “to a fairly esoteric set of applications”).[7]
The Court’s decision also overwhelms 17 U. S. C. §602(a)(3)’s exceptions to §602(a)(l)’s importation prohibition. 2 P. Goldstein, Copyright § 7.6.1.2(a), p. 7:141 (3d ed. 2012) (hereinafter Goldstein).[8] Those exceptions permit the *567 importation of copies without the copyright owner’s authorization for certain governmental, personal, scholarly, educational, and religious purposes. 17 U. S. C. § 602(a)(3). .Copies imported under these exceptions “will often be lawfully made gray market goods' purchased through normal market channels abroad.” 2 Goldstein § 7.6.1.2(a), at 7:141.[9] But if, as the Court holds, such copies can in any event be imported by virtue of § 109(a), § 602(a)(3)’s work has already been done. For example, had Congress conceived of §109(a)’s sweep as the Court does, what earthly reason would there be to provide, as Congress did in § 602(a)(3)(C), that a library may import “no more than five copies” of a nonaudiovisual work for its “lending or archival purposes”?
The far more plausible reading of §§ 109(a) and 602(a), then, is that Congress intended § 109(a) to apply to copies made in the United States, not to copies manufactured and sold abroad. That reading of the first sale and importation provisions leaves § 602(a)(3)’s exceptions with real, meaningful work to do. See TRW Inc. v. Andrews, 534 U. S. 19, 31 (2001) (“It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.” (internal quotation marks omitted)). In the range of circumstances covered by the exceptions, § 602(a)(3) frees individuals and entities who purchase foreign-made copies abroad from the requirement they *568 would otherwise face under § 602(a)(1) of obtaining the copyright owner’s permission to import the copies into the United States.[10]
Ill
The history of § 602(a)(1) reinforces the conclusion I draw from the text of the relevant provisions: § 109(a) does not apply to copies manufactured abroad. Section 602(a)(1) was enacted as part of the Copyright Act of 1976, 90 Stat. 2589-2590. That Act was the product of a lengthy revision effort overseen by the U. S. Copyright Office. See Mills Music, Inc. v. Snyder, 469 U. S. 153, 159-160 (1985). In its initial 1961 report on recommended revisions, the Copyright Office noted that publishers had “suggested that the [then-existing] import ban on piratical copies should be extended to bar the importation of . . . foreign edition^]” in violation of “agree *569 ments to divide international markets for copyrighted works.” Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess., .126 (H. R. Judiciary Comm. Print 1961) (hereinafter Copyright Law Revision). See Copyright Act of 1947, § 106, 61 Stat. 663 (“The importation into the United States ... of any piratical copies of any work copyrighted in the United States ... is prohibited.”). The Copyright Office originally recommended against such an extension of the importation ban, reasoning that enforcement of territorial restrictions was best left to contract law. Copyright Law Revision 126.
Publishing-industry representatives argued strenuously against the position initially taken by the Copyright Office. At a 1962 panel discussion on the Copyright Office’s report, for example, Horace Manges of the American Book Publishers Council stated:
“When a U. S. book publisher enters into a contract with a British publisher to acquire exclusive U. S. rights for a particular book, he often finds that the English edition ... of that particular book finds its way into this country. Now it’s all right to say, ‘Commence a lawsuit for breach of contract.’ But this is expensive, burdensome, and, for the most part, ineffective.” Copyright Law Revision Part 2: Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 88th Cong., 1st Sess., 212 (H. R. Judiciary Comm. Print 1963).
Sidney Diamond, representing London Records, elaborated on Manges’ statement. “There are many situations,” he explained, “in which it is not necessarily a question of the inadequacy of a contract remedy—in the sense that it may be difficult or not quick enough to solve the particular problem.” Id., at 213. “Very frequently,” Diamond stated, publishers “run into a situation where ... copies of [a] work... produced *570 in a foreign country... may be shipped [to the United States] without violating any contract of the U. S. copyright proprietor.” Ibid. To illustrate, Diamond noted, if a “British publisher [sells a copy] to an individual who in turn ship[s] it over” to the United States, the individual’s conduct would not “violate [any] contract between the British and the American publisher.” Ibid. In such a case, “no possibility of any contract remedy” would exist. Ibid. The facts of Kirtsaeng’s case fit Diamond’s example, save that the copies at issue here were printed and initially sold in Asia rather than Great Britain.
After considering comments on its 1961 report, the Copyright Office “prepared a preliminary draft of provisions for a new copyright statute.” Copyright Law Revision Part 3: Preliminary Draft for Revised U. S. Copyright Law and Discussions and Comments on the Draft, 88th Cong., 2d Sess., v (H. R. Judiciary Comm. Print 1964). Section 44 of the draft statute addressed the concerns raised by publishing-industry representatives. In particular, § 44(a) provided:
“Importation into the United States of copies or records of a work for the purpose of distribution to the public shall, if such articles are imported without the authority of the owner of the exclusive right to distribute copies or records under this title, constitute an infringement of copyright actionable under section 35 [1 e., the section providing for a private cause of action for copyright infringement].” Id., at 32-33.
In a 1964 panel discussion regarding the draft statute, Abe Goldman, the Copyright Office’s General Counsel, left no doubt about the meaning of § 44(a). It represented, he explained, a “shif[t]” from the Copyright Office’s 1961 report, which had recommended against using copyright law to facilitate publishers’ efforts to segment international markets. Copyright Law Revision Part 4: Further Discussions and *571 Comments on Preliminary Draft for Revised U. S. Copyright Law, 88th Cong., 2d Sess., 203 (H. R. Judiciary Comm. Print 1964). Section 44(a), Goldman stated, would allow copyright owners to bring infringement actions against importers of “foreign copies that were made under proper authority.” Ibid. See also id., at 205-206 (Goldman agreed with a speaker’s comment that § 44(a) “enlarge[d]” U. S. copyright law by extending import prohibitions “to works legally produced in Europe” and other foreign countries).[11]
The next step in the copyright revision process was the introduction in Congress of a draft bill on July 20,1964. See Copyright Law Revision Part 5:1964 Revision Bill with Discussions and Comments, 89th Cong., 1st Sess., in (H. R. Judiciary Comm. Print 1965). After another round of public comments, a revised bill was introduced on February 4,1965. See Copyright Law Revision Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., v (H. R. Judiciary Comm. Print 1965) (hereinafter Copyright Law Revision Part 6). In language closely resembling the statutory text later enacted by Congress, § 602(a) of the 1965 bill provided:
“Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work for the purpose of distribution to the public is an infringement of the exclusive right *572 to distribute copies or phonorecords under section 106, actionable under section 501.” Id., at 292.[12]
The Court implies that the 1965 bill’s “explicift] refer[enee] to § 106” showed a marked departure from § 44(a) of the Copyright Office’s prior draft. Ante, at 550. The Copyright Office, however, did not see it that way. In its summary of the 1965 bill’s provisions, the Copyright Office observed that § 602(a) of the 1965 bill, like § 44(a) of the Copyright Office’s prior draft, see supra, at 571 and this page, permitted copyright owners to bring infringement actions against unauthorized importers in cases “where the copyright owner had authorized the making of [the imported] copies in a foreign country for distribution only in that country.” Copyright Law Revision Part 6, at 149-150. See also id., at xxvi (Under § 602(a) of the 1965 bill, “[a]n unauthorized importer could be enjoined and sued for damages both where the copies or phonorecords he was importing were ‘piratical’ (that is, where their making would have constituted an infringement if the U. S. copyright law could have been applied), and where their making was ‘lawful.’”).
The current text of § 602(a)(1) was finally enacted into law in 1976. See Copyright Act of 1976, § 602(a), 90 Stat. 2589-2590. The House and Senate Committee Reports on the 1976 Act demonstrate that Congress understood, as did the Copyright Office, just what that text meant. Both Reports state:
*573 “Section 602 [deals] with two separate situations: importation of ‘piratical’ articles (that is, copies or phonorec-ords made without any authorization of the copyright owner), and unauthorized importation of copies or pho-norecords that were lawfully made. The general approach of section 602 is to make unauthorized importation an act of infringement in both cases, but to permit the Bureau of Customs to prohibit importation only of ‘piratical’ articles.” S. Rep. No. 94-473, p. 151 (1975) (emphasis added). See also H. R. Rep. No. 94-1476, p. 169 (1976) (same).
In sum, the legislative history of the Copyright Act of 1976 is hardly “inconclusive.” Ante, at 549. To the contrary, it confirms what the plain text of the Act conveys: Congress intended § 602(a)(1) to provide copyright owners with a remedy against the unauthorized importation of foreign-made copies of their works, even if those copies were made and sold abroad with the copyright owner’s authorization.[13]
IV
Unlike the Court’s holding, my position is consistent with the stance the United States has taken in international-trade negotiations. This ease bears on the highly contentious trade issue of interterritorial exhaustion. The issue arises because intellectual property law is territorial in nature, see supra, at 562, which means that creators of intellectual property “may hold a set of parallel” intellectual property rights under the laws of different nations. Chiappetta, The Desirability of Agreeing To Disagree: The WTO, TRIPS, International IPR Exhaustion and a Few Other Things, 21 Mich. J. *574 Int’l L. 333, 340-341 (2000) (hereinafter Chiappetta). There is no international consensus on whether the sale in one country of a good incorporating protected intellectual property exhausts the intellectual property owner’s right to control the distribution of that good elsewhere. Indeed, the members of the World Trade Organization, “agreeing to disagree,”[14] provided in Article 6 of the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS), Apr. 15, 1994, 33 I. L. M. 1197, 1200, that “nothing in this Agreement shall be used to address the issue of . . . exhaustion.” See Chiappetta 346 (observing that exhaustion of intellectual property rights was “hotly debated” during the TRIPS negotiations and that Article 6 “reflects [the negotiators’] ultimate inability to agree” on a single international standard). Similar language appears in other treaties to which the United States is a party. See World Intellectual Property Organization (WIPO) Copyright Treaty, Art. 6(2), Dec. 20, 1996, S. Treaty Doc. No. 105-17, p. 7 (“Nothing in this Treaty shall affect the freedom of Contracting Parties to determine the conditions, if any, under which the exhaustion of the right [to control distribution of copies of a copyrighted work] applies after the first sale or other transfer of ownership of the original or a copy of the work with the authorization of the author.”); WIPO Performances and Pho-nograms Treaty, Art. 8(2), Dec. 20, 1996, S. Treaty Doc. No. 105-17, p. 28 (containing language nearly identical to Article 6(2) of the WIPO Copyright Treaty).
In the absence of agreement at the international level, each country has been left to choose for itself the exhaustion framework it will follow. One option is a national-exhaustion regime, under which a copyright owner’s right to *575 control distribution of a particular copy is exhausted only within the country in which the copy is sold. See Forsyth & Rothnie, Parallel Imports, in The Interface Between Intellectual Property Rights and Competition Policy 429, 430 (S. Anderman ed. 2007) (hereinafter Forsyth & Rothnie). Another option is a rule of international exhaustion, under which the authorized distribution of a particular copy anywhere in the world exhausts the copyright owner’s distribution right everywhere with respect to that copy. See ibid. The European Union has adopted the intermediate approach of regional exhaustion, under which the sale of a copy anywhere within the European Economic Area exhausts the copyright owner’s distribution right throughout that region. See id., at 430, 445. Section 602(a)(1), in my view, ties the United States to a national-exhaustion framework. The Court’s decision, in contrast, places the United States solidly in the international-exhaustion camp.
Strong arguments have been made both in favor of, and in opposition to, international exhaustion. See Chiappetta 360 (“[rjeasonable people making valid points can, and do, reach conflicting conclusions” regarding the desirability of international exhaustion). International exhaustion subjects copyright-protected goods to competition from lower priced imports and, to that extent, benefits consumers. Correspondingly, copyright owners profit from a national-exhaustion regime, which also enlarges the monetary incentive to create new copyrightable works. See Forsyth & Rothnie 432-437 (surveying arguments for and against international exhaustion).
Weighing the competing policy concerns, our Government reached the conclusion that widespread adoption of the international-exhaustion framework would be inconsistent with the long-term economic interests of the United States. See Brief for United States as Amicus Curiae in Quality King, O. T. 1997, No. 96-1470, pp. 22-26 (hereinafter Quality *576 King Brief).[15] Accordingly, the United States has steadfastly “taken the position in international trade negotiations that domestic copyright owners should . .. have the right to prevent the unauthorized importation of copies of their work sold abroad.” Id., at 22. The United States has “advanced this position in multilateral trade negotiations,” including the negotiations on the TRIPS Agreement. Id., at 24. See also D. Gervais, The TRIPS Agreement: Drafting History and Analysis §2.63, p. 199 (3d ed. 2008). It has also taken a dim view of our trading partners’ adoption of legislation incorporating elements of international exhaustion. See Clapperton & Corones, Locking in Customers, Locking Out Competitors: Anti-Circumvention Laws in Australia and Their Potential Effect on Competition in High Technology Markets, 30 Melbourne U. L. Rev. 657, 664 (2006) (United States expressed concern regarding international-exhaustion legislation in Australia); Montén, Comment, The Inconsistency Between Section 301 and TRIPS: Counterproductive With Respect to the Future of International Protection of Intellectual Property Rights? 9 Marq. Intellectual Property *577 L. Rev. 387, 417-418 (2005) (same with respect to New Zealand and Taiwan).
Even if the text and history of the Copyright Act were ambiguous on the answer to the question this case presents—which they are not, 'see Parts II—III, supra[16]—I would resist a holding out of accord with the firm position the United States has taken on exhaustion in international negotiations. Quality King, I acknowledge, discounted the Government’s concerns about potential inconsistency with United States obligations under certain bilateral trade agreements. See 523 U. S., at 153-154. See also Quality King Brief 22-24 (listing the agreements). That decision, however, dealt only with copyright-protected products made in the United States. See 523 U. S., at 154 (Ginsburg, J., concurring). Quality King left open the question whether owners of U. S. copyrights could retain control over the importation of copies manufactured and sold abroad—a point the Court obscures, see ante, at 553 (arguing that Quality King “significantly eroded” the national-exhaustion principle that, in my view, § 602(a)(1) embraces). The Court today answers that question with a resounding “no,” and in doing so, it risks undermining the United States’ credibility on the world stage. While the Government has urged our trading partners to refrain from adopting international-exhaustion regimes that could benefit consumers within their borders but would impact adversely on intellectual property producers in the United States, the Court embraces an international-exhaustion rule that could benefit U. S. consumers but would likely disadvantage foreign holders of U. S. *578 copyrights. This dissonance scarcely enhances the United States’ “role as a trusted partner in multilateral endeavors.” Vimar Seguros y Reasequros, S. A. v. M/V Sky Reefer, 515 U. S. 528, 539 (1995).
V
I turn now to the Court’s justifications for a decision difficult to reconcile with the Copyright Act’s text and history.
A
The Court asserts that its holding “is consistent with antitrust laws that ordinarily forbid market divisions.” Ante, at 552-553. See also ante, at 539 (again referring to antitrust principles). Section 602(a)(1), however, read as I do and as the Government does, simply facilitates copyright owners’ efforts to impose “vertical restraints” on distributors of copies of their works. See Forsyth & Rothnie 435 (“Parallel importation restrictions enable manufacturers and distributors to erect ‘vertical restraints’ in the market through exclusive distribution agreements.”). See generally Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U. S. 877 (2007) (discussing vertical restraints). We have held that vertical restraints are not per se illegal under § 1 of the Sherman Act, 15 U. S. C. § 1, because such “restraints can have procompetitive effects.” 551 U. S., at 881-882.[17]
*579 B
The Court sees many “horribles” following from a holding that the § 109(a) phrase “lawfully made under this title” does not encompass foreign-made copies. Ante, at 543 (internal quotation marks omitted). If § 109(a) excluded foreign-made copies, the Court fears, then copyright owners could exercise perpetual control oyer the downstream distribution or public display of such copies. A ruling in Wiley’s favor, the Court asserts, would shutter libraries, put used-book dealers out of business, cripple art museums, and prevent the resale of a wide range of consumer goods, from cars to calculators. Ante, at 540-543. See also ante, at 555 (Kagan, J., concurring) (expressing concern about “imposing downstream liability on those who purchase and resell in the United States copies that happen to have been manufactured abroad”). Copyright law and precedent, however, erect barriers to the anticipated horribles.[18]
1
Recognizing that foreign-made copies fall outside the ambit of § 109(a) would not mean they are forever free of the first sale doctrine. As earlier observed, see supra, at 558, the Court stated that doctrine initially in its 1908 Bobbs-Merrill decision. At that time, no statutory provision expressly codified the first sale doctrine. Instead, copyright law merely provided that copyright owners had “the sole liberty of printing, reprinting, publishing, completing, copying, exe *580 cuting, finishing, and vending” their works. Copyright Act of 1891, § 1, 26 Stat. 1107.
In Bobbs-Merrill, the Court addressed the scope of the statutory right to “ven[d].” In granting that right, the Court held, Congress did not intend to permit copyright owners “to fasten ... a restriction upon the subsequent alienation of the subject-matter of copyright after the owner had parted with the title to one who had acquired full dominion over it and had given a satisfactory price for it.” 210 U. S., at 349-350. “[0]ne who has sold a copyrighted article . . . without restriction,” the Court explained, “has parted with all right to control the sale of it.” Id., at 350. Thus, “[t]he purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it.” Ibid.
Under the logic of Bobbs-Merrill, the sale of a foreign-manufactured copy in the United States carried out with the copyright owner’s authorization would exhaust the copyright owner’s right to “vend” that copy. The copy could thenceforth be resold, lent out, or otherwise redistributed without further authorization from the copyright owner. Although § 106(3) uses the word “distribute” rather than “vend,” there is no reason to think Congress intended the word “distribute” to bear a meaning different from the construction the Court gave to the word “vend” in Bobbs-Merrill. See ibid. (emphasizing that the question before the Court was “purely [one] of statutory construction”).[19] Thus, in accord with Bobbs-Merrill, the first authorized distribution of a foreign-made copy in the United States exhausts the copyright own *581 er’s distribution right under § 106(3). After such an authorized distribution, a library may lend, or a used-book dealer may resell, the foreign-made copy without seeking the copyright owner’s permission. Cf. ante, at 541-542.
For example, if Wiley, rather-than Kirtsaeng, had imported into the United States and then sold the foreign-made textbooks at issue in this case, Wiley’s § 106(3) distribution right would have been exhausted under the rationale of Bobbs-Merrill. Purchasers of the textbooks would thus be free to dispose of the books as they wished without first gaining a license from Wiley.
This line of reasoning, it must be acknowledged, significantly curtails the independent effect of § 109(a). If, as I maintain, the term “distribute” in § 106(3) incorporates the first sale doctrine by virtue of Bobbs-Merrill, then § 109(a)’s codification of that doctrine adds little to the regulatory regime.[20] Section 109(a), however, does serve as a statutory *582 bulwark against courts deviating from Bobbs-Merrill in a way that increases copyright owners’ control over downstream distribution, and legislative history indicates that is precisely the role Congress intended § 109(a) to play. Congress first codified the first sale doctrine in § 41 of the Copyright Act of 1909, 35 Stat. 1084.[21] It did so, the House Committee Report on the 1909 Act explains, “in order to make . . . clear that [Congress had] no intention [of] enlarging] in any way the construction to be given to the word ‘vend.’” H. R. Rep. No. 2222, 60th Cong, 2d Sess., 19 (1909). According to the Committee Report, §41 was “not intended to change [existing law] in any way.” Ibid. The position I have stated and explained accords with this expression of congressional intent. In enacting §41 and its successors, I would hold, Congress did not “change ... existing law,” ibid., by stripping the word “vend” (and thus its substitute “distribute”) of the limiting construction imposed in Bobbs-Merrill.
In any event, the reading of the Copyright Act to which I subscribe honors Congress’ aim in enacting § 109(a) while the Court’s reading of the Act severely diminishes §602(a)(l)’s role. See supra, at 566-568. My position in no way tugs against the principle underlying § 109(a)—i. e., that certain conduct by the copyright owner exhausts the owner’s § 106(3) distribution right. The Court, in contrast, fails to give meaningful effect to Congress’ manifest intent in § 602(a)(1) to grant copyright owners the right to control the importation of foreign-made copies of their works.
*583 2
Other statutory prescriptions provide further protection against the absurd consequences imagined by the Court. For example, § 602(a)(3)(C).- permits “an organization operated for scholarly, educational, or religious purposes” to import, without the copyright owner’s authorization, up to five foreign-made copies of a nonaudiovisual work—notably, a book—for “library lending or archival purposes.” But cf. ante, at 541 (suggesting that affirming the Second Circuit’s decision might prevent libraries from lending foreign-made books).[22]
The Court also notes that amici representing art museums fear that a ruling in Wiley’s favor would prevent museums from displaying works of art created abroad. Ante, at 543 (citing Brief for Association of Art Museum Directors et al.). These amici observe that a museum’s right to display works of art often depends on 17 U. S. C. § 109(c). See Brief for Association of Art Museum Directors et al. 11-13.[23] That provision addresses exhaustion of a copyright owner’s exclusive right under § 106(5) to publicly display the owner’s work. Because § 109(c), like § 109(a), applies only to copies “lawfully made under this title,” amici contend that a ruling in Wiley’s *584 favor would prevent museums from invoking § 109(c) with respect to foreign-made works of art. Id., at 11-13.[24]
Limiting § 109(c) to U. S.-made works, however, does not bar art museums from lawfully displaying works made in other countries. Museums can, of course, seek the copyright owner’s permission to display a work. Furthermore, the sale of a work of art to a U. S. museum may carry with it an implied license to publicly display the work. See 2 Patry §5:131, at 5-280 (“[C]ourts have noted the potential availability of an implied nonexclusive licensfe] when the circumstances . . . demonstrate that the parties intended that the work would be used for a specific purpose.”). Displaying a work of art as part of a museum exhibition might also qualify as a “fair use” under 17 U. S. C. § 107. Cf. Bouchat v. Baltimore Ravens Ltd. Partnership, 619 F. 3d 301, 313-316 (CA4 2010) (display of copyrighted logo in museum-like exhibition constituted “fair use”).
The Court worries about the resale of foreign-made consumer goods “contain[ing] copyrightable software programs or packaging.” Ante, at 542. For example, the Court observes that a car might be programmed with diverse forms of software, the copyrights to which might be owned by individuals or entities other than the manufacturer of the car. Ibid. Must a car owner, the Court asks, obtain permission from all of these various copyright owners before reselling her car? Ibid. Although this question strays far from the one presented in this case and briefed by the parties, principles of fair use and implied license (to the extent that express licenses do not exist) would likely permit the car to be resold without the copyright owners’ authorization.[25]
*585 Most telling in this regard, no court, it appears, has been called upon to answer any of the Court’s “horribles” in an actual case. Three decades have passed since a federal court first published an opinion reading § 109(a) as applicable exclusively to copies made in the United States. See Columbia Broadcasting System, Inc. v. Scorpio Music Distributors, Inc., 569 F. Supp. 47, 49 (ED Pa. 1983), summarily aff’d, 738 F. 2d 424 (CA3 1984) (table). Yet Kirtsaeng and his supporting amici cite not a single case in which the owner of a consumer good authorized for sale in the United States has been sued for copyright infringement after reselling the item or giving it away as a gift or to charity. The absence of such lawsuits is unsurprising. Routinely suing one’s customers is hardly a best business practice.[26] Manufacturers, moreover,, may be hesitant to do business with *586 software programmers taken to suing consumers. Manufacturers may also insist that software programmers agree to contract terms barring such lawsuits.
The Court provides a different explanation for the absence of the untoward consequences predicted in its opinion— namely, that lower court decisions regarding the scope of § 109(a)’s first sale prescription have not been uniform. Ante, at 544. Uncertainty generated by these conflicting decisions, the Court notes, may have deterred some copyright owners from pressing infringement claims. Ante, at 544-545. But if, as the Court suggests, there are a multitude of copyright owners champing at the bit to bring lawsuits against libraries, art museums, and consumers in an effort to exercise perpetual control over the downstream distribution and public display of foreign-made copies, might one not expect that at least a handful of such lawsuits would have been filed over the past 30 years? The absence of such suits indicates that the “practical problems” hypothesized by the Court are greatly exaggerated. Ante, at 545.[27] They surely do *587 not warrant disregarding Congress’ intent, expressed in § 602(a)(1), to grant copyright owners the authority to bar the importation of foreign-made copies of their works. Cf. Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U. S. 1, 6 (2000) (“[W]hen the statute’s language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.” (internal quotation marks omitted)).
VI
To recapitulate, the objective of statutory interpretation is “to give effect to the intent of Congress.” American Trucking Assns., 310 U. S., at 542. Here, two congressional aims are evident. First, in enacting § 602(a)(1), Congress intended to grant copyright owners permission to segment international markets by barring the importation of foreign-made copies into the United States. Second, as codification of the first sale doctrine underscores, Congress did not want the exclusive distribution right conferred in §106(3) to be boundless. Instead of harmonizing these objectives, the Court subordinates the first entirely to the second. It is unsurprising that none of the three major treatises on U. S. copyright law embrace the Court’s construction of § 109(a). See 2 Nimmer §8.12[B][6][c], at 8-184.34 to 8-184.35; 2 Gold-stein § 7.6.1.2(a), at 7:141; 4 Patry §§13:22, 13:44, 13:44.10.
Rather than adopting the very international-exhaustion rule the United States has consistently resisted in international-trade negotiations, I would adhere to the national-exhaustion framework set by the Copyright Act’s text and history. Under that regime, codified in § 602(a)(1), Kirtsaeng’s unauthorized importation of the foreign-made textbooks involved in this ease infringed Wiley’s copyrights. I would therefore affirm the Second Circuit’s judgment.

 In 2008, Congress renumbered what was previously § 602(a) as § 602(a)(1). See Prioritizing Resources and Organization for Intellectual Property Act of 2008 (PROIPA), § 105(b)(2), 122 Stat. 4259. Like the Court, I refer to the provision by its current numbering.

 Although Justice Kagan’s concurrence suggests that Quality King erred in “holding that § 109(a) limits § 602(a)(1),” ante, at 555, that recent, unanimous holding must be taken as a given. See John R. Sand & Gravel Co. v. United States, 552 U. S. 130, 139 (2008) (“[S]tare decisis in respect to statutory interpretation has ‘special force,’ for ‘Congress remains free to alter what we have done.’ ” (quoting Patterson v. McLean Credit Union, 491 U. S. 164, 172-173 (1989))). The Court’s objective in this case should be to avoid unduly “eonstrict[ing] the scope of § 602(a)(1)’s ban on unauthorized importation,’’ ante, at 554 (opinion of Kagan, J.), while at the same time remaining faithful to Quality King’s holding and to the text and history of other Copyright Act provisions. This aim is not difficult to achieve. See Parts II-V, infra. Justice Kagan and I appear to agree to this extent: Congress meant the ban on unauthorized importation to have real force. See ante, at 556 (acknowledging that “Wiley may have a point about what § 602(a)(1) was designed to do”).

 See Quality King Distributors, Inc. v. L’anza Research Int'l, Inc., 523 U. S. 135, 148, n. 20 (1998) (quoting Copyright Law Revision Part 4: Further Discussions and Comments on Preliminary Draft for Revised U. S. Copyright Law, 88th Cong., 2d Sess., 119 (H. R. Judiciary Comm. Print 1964) (hereinafter Copyright Law Revision Part 4) (statement of Harriet Pilpel)).

 The Court asserts that my position gives the word “lawfully” in § 109(a) “little, if any, linguistic work to do.” Ante, at 530-531. That is not so. My reading gives meaning to each word in the phrase “lawfully made under this title.” The word “made” signifies that the conduct at issue is the creation or manufacture of a copy. See Webster’s Third New International Dictionary 1356 (1961) (defining “made” as “artificially produced by a manufacturing process”). The word “lawfully” indicates that for § 109(a) to apply, the copy’s creation must have complied with some body of law. Finally, the prepositional phrase “under this title” clarifies what that body of law is—namely, the copyright prescriptions contained in Title 17 of the U. S. Code.

 Attempting to show that my reading of § 109(a) is susceptible to the same criticism, the Court points to the now-repealed “manufacturing clause,” which required “copies of a work consisting preponderantly of nondramatic literary material... in the English language” to be “manufactured in the United States or Canada.” Copyright Act of 1976, § 601(a), 90 Stat. 2588. Because Congress expressly referred to manufacturing in this provision, the Court contends, the phrase “lawfully made under this title” in § 109(a) cannot mean “manufactured in the United States.” Ante, at 540. This argument is a non sequitur. I do not contend that the *565 phrases “lawfully made under this title” and “manufactured in the United States” are interchangeable. To repeat, I read the phrase “lawfully made under this title” as referring to instances in which a copy’s creation is governed by, and conducted in compliance with, Title 17 of the U. S. Code. See supra, at 561. Not all copies “manufactured in the United States” will satisfy this standard. For example, piratical copies manufactured in the United States without the copyright owner’s authorization are not “lawfully made under [Title 17].” Nor would the phrase “lawfully manufactured in the United States” be ah exact substitute for “lawfully made under this title.” The making of a copy may be lawful under Title 17 yet still violate some other provision of law. Consider, for example, a copy made with the copyright owner’s authorization by workers who are paid less than minimum wage. The copy would be “lawfully made under [Title 17]” in the sense that its creation would not violate any provision of that title, but the copy’s manufacturing would nonetheless be unlawful due to the violation of the minimum-wage laws.

 When § 602(a)(1) was originally enacted in 1976, it played an additional role—providing a private cause of action against importers of piratical goods. See Quality King, 523 U. S., at 146. In 2008, however, Congress amended §602 to provide for such a cause of action in § 602(a)(2), which prohibits the unauthorized “[importation into the United States ... of copies or phonorecords, the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if [Title 17] had been applicable.” See PROIPA, § 105(b)(3), 122 Stat. 4259-4260. Thus, under the Court’s interpretation, the only conduct reached by § 602(a)(1) but not § 602(a)(2) is a nonowner’s unauthorized importation of a nonpiratical copy.

 Notably, the Court ignores the history of § 602(a)(1), which reveals that the primary purpose of the prescription was not to provide a remedy against rogue licensees, consignees, and bailees, against whom copyright owners could frequently assert breach-of-contract claims even in the absence of § 602(a)(1). Instead, the primary purpose of § 602(a)(1) was to reach third-party importers, enterprising actors like Kirtsaeng, against whom copyright owners could not assert contract claims due to lack of privity. See Part III, infra.

 Section 602(a)(3) provides:
“This subsection [i. e., § 602(a)] does not apply to—
“(A) importation or exportation of copies or phonoreeords under the authority or for the use of the Government of the United States or of any State or political subdivision of a State, but not including copies or phonoreeords for use in schools, or copies of any audiovisual work imported for purposes other than archival use;
“(B) importation or exportation, for the private use of the importer or exporter and not for distribution, by any person with respect to no more than one copy or phonorecord of any one work at any one time, or by any person arriving from outside the United States or departing from the United States with respect to copies or phonoreeords forming part of such person’s personal baggage; or
“(C) importation by or for an organization operated for scholarly, educational, or religious purposes and not for private gain, with respect to no more than one copy of an audiovisual work solely for its archival purposes, *567 and no more than five copies or phonorecords of any other work for its library lending or archival purposes, unless the importation of such copies or phonorecords is part of an activity consisting of systematic reproduction or distribution, engaged in by such organization in violation of the provisions of section 108(g)(2).”

 The term “gray market good” refers to a good that is “imported outside the distribution channels that have been contractually negotiated by the intellectual property owner.” Forsyth & Rothnie, Parallel Imports, in The Interface Between Intellectual Property Rights and Competition Policy 429 (S. Anderman ed. 2007). Such goods are also commonly called “parallel imports.” Ibid.

 The Court asserts that its reading of § 109(a) is bolstered by §104, which extends the copyright “protection[s]” of Title 17 to a wide variety of foreign works. See ante, at 532. The “protection under this title” afforded by § 104, however, is merely protection against infringing conduct within the United States, the only place where Title 17 applies. See 4 W. Patry, Copyright §13:44.10, pp. 13-128 to 13-129 (2012) (hereinafter Patry). Thus, my reading of the phrase “under this title” in § 109(a) is consistent with Congress’ use of that phrase in § 104. Furthermore, § 104 describes which works are entitled to copyright protection under U. S. law. But no one disputes that Wiley’s copyrights in the works at issue in this case are valid. The only question is whether Kirtsaeng’s importation of copies of those works infringed Wiley’s copyrights. It is basic to copyright law that “[o]wnership of a copyright... is distinct from ownership of any material object in which the work is embodied.” 17 U. S. C. § 202. See also § 101 (‘“Copies’ are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.”). Given the distinction copyright law draws between works and copies, § 104 is inappo-site to the question here presented. 4 Patry § 13:44.10, at 13-129 (“There is no connection, linguistically or substantively, between Seetion[s] 104 and 109: Section 104 deals with national eligibility for the intangible work of authorship; Section 109(a) deals with the tangible, physical embodiment of the work, the ‘copy.’ ”).

 As the Court observes, ante, at 549-550, Irwin Karp of the Authors League of America stated at the 1964 panel discussion that § 44(a) ran counter to “the very basic concept of copyright law that, once you’ve sold a copy legally, you can’t restrict its resale.” Copyright Law Revision Part 4, at 212. When asked if he was “presenting ... an argument against” § 44(a), however, Karp responded that he was “neutral on th[e] provision.” Id,., at 211. There is thus little reason to believe that any changes to the wording of § 44(a) before its codification in § 602(a) were made in response to Karp’s discussion of “the problem of restricting [the] transfer of.... lawfully obtained [foreign] copies.” Ibid.

 There is but one difference between this language from the 1965 bill and the corresponding language in the current version of § 602(a)(1): In the current version, the phrase “for the purpose of distribution to the public” is omitted and the phrase “that have been acquired outside the United States” appears in its stead. There are no material differences between the quoted language from the 1965 bill and the corresponding language contained in the 1964 bill. See Copyright Law Revision Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., 292-293 (H. R. Judiciary Comm. Print 1965).

 The Court purports to find support for its position in the House and Senate Committee Reports on the 1976 Copyright Act. Ante, at 550-551. It fails to come up with anything in the Act’s legislative history, however, showing that Congress understood the words “lawfully made under this title” in § 109(a) to encompass foreign-made copies.

 Chiappetta, The Desirability of Agreeing To Disagree: The WTO, TRIPS, International IPR Exhaustion and a Few Other Things, 21 Mich. J. Int’l L. 333, 340 (2000) (hereinafter Chiappetta) (internal quotation marks omitted).

 The Court states that my “reliance on the Solicitor General’s position in Quality King is undermined by his agreement in that case with [the] reading of § 109(a)” that the Court today adopts. Ante, at 553. The United States’ principal concern in both Quality King and this case, however, has been to protect copyright owners’ “right to prevent parallel imports.” Brief for United States as Amicus Curiae in Quality King, O. T. 1997, No. 96-1470, p. 6 (hereinafter Quality King Brief). See also Brief for United States as Amicus Curiae 14 (arguing that Kirtsaeng’s interpretation of § 109(a), which the Court adopts, would “subver[t] Section 602(a)(l)’s ban on unauthorized importation”). In Quality King, the Solicitor General urged this Court to hold that § 109(a)’s codification of the first sale doctrine does not limit the right to control importation set forth in § 602(a). Quality King Brief 7-30. After Quality King rejected that contention, the United States reconsidered its position, and it now endorses the interpretation of the § 109(a) phrase “lawfully made under this title” I would adopt. Brief for United States as Amicus Curiae 6-7, 13-14.

 Congress hardly lacks capacity to provide for international exhaustion when that is its intent. Indeed, Congress has expressly provided for international exhaustion in the narrow context of semiconductor chips embodying protected “mask works.” See 17 U. S. C. §§905(2), 906(b). See also 2 M. Nimmer & D. Nimmer, Copyright §8A.06[E], p. 8A-37 (2012) (hereinafter Nimmer) (“[T]he first sale doctrine under [§ 906(b)] expressly immunizes unauthorized importation.”).

 Despite the Court’s suggestion to the contrary, this case in no way implicates the per se antitrust prohibition against horizontal ‘“[a]gree-ments between competitors to allocate territories to minimize competition.’” Ante, at 553 (quoting Palmer v. BRG of Ga., Inc., 498 U. S. 46, 49 (1990) (per curiam)). Wiley is not requesting authority to enter into collusive agreements with other textbook publishers that would, for example, make Wiley the exclusive supplier of textbooks on particular subjects within particular geographic regions. Instead, Wiley asserts no more than the prerogative to impose vertical restraints on the distribution of its own textbooks. See Hovenkamp, Post-Sale Restraints and Competitive Harm: The First Sale Doctrine in Perspective, 66 N. Y. U. Ann. Survey Am. L. 487, 488 (2011) (“vertical restraints” include “limits [on] the way a seller’s own product can be distributed”).

 As the Court observes, ante, at 553, the United States stated at oral argument that the tyfSes of “horribles” predicted in the Court’s opinion would, if they came to pass, be “worse than the frustration of market segmentation” that will result from the Court’s interpretation of § 109(a). Tr. of Oral Arg. 51. The United States, however, recognized that this purported dilemma is a false one. As the United States explained, the Court’s horribles can be avoided while still giving meaningful effect to § 602(a)(l)’s ban on unauthorized importation. Ibid.

 It appears that the Copyright Act of 1976 omitted the word “vend” and introduced the word “distribute” to avoid the “redundan[cy]” present in pre-1976 law. Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U. S'. Copyright Law, 87th Cong., 1st Sess., 21 (H. R. Judiciary Comm. Print' 1961) (noting that the exclusive rights to “publish” and “vend” works under the Copyright Act of 1947, § 1(a), 61 Stat. 652-653, were “redundant”).'

 My position that Bobbs-Merrill lives on as a limiting construction of the § 106(3) distribution right does not leave § 109(a) with no work to do. There can be little doubt that the books at issue in Bobbs-Merrill were published and first sold in the United States. See Bobbs-Merrill Co. v. Straus, 139 F. 155, 157 (CC SDNY 1905) (the publisher claiming copyright infringement in Bobbs-Merrill was incorporated and had its principal office in Indiana). See also Copyright Act of 1891, § 3, 26 Stat. 1107-1108 (generally prohibiting importation, even by the copyright owner, of foreign-manufactured copies of copyrighted books); 4 Patry § 13:40, at 13-111 (under the Copyright Act of 1891, “copies of books by both foreign and U. S. authors had to be printed in the United States”). But cf. ante, at 539 (asserting, without acknowledging the 1891 Copyright Aet’s general prohibition against the importation of foreign-made copies of copyrighted books, that the Court is unable to find any “geographical distinctions . . . in Bobbs-Merrill”). Thus, exhaustion occurs under Bobbs-Merrill only when a copy is distributed within the United States with the copyright owner’s permission, not when it is distributed abroad. But under § 109(a), as interpreted in Quality King, any authorized distribution of a U. S.made copy, even a distribution occurring in a foreign country, exhausts the copyright owner’s distribution right under § 106(3). See 523 U. S., at 145, n. 14. Section 109(a) therefore provides for exhaustion in a circumstance not reached by Bobbs-Merrill.

 Section 41 of the 1909 Act provided: “[N]othing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.” 35 Stat. 1084. This language was repeated without material change in §27 of the Copyright Act of 1947, 61 Stat. 660. As noted above, see supra, at 558, 17 U. S. C. § 109(a) sets out the current codification of the first sale doctrine.

 A group of amici representing libraries expresses the concern that lower courts might interpret § 602(a)(3)(C) as authorizing only the importing, but not the lending, of foreign-made copies of nonaudiovisual works. See Brief for American Library Association et al. 20. The United States maintains, and I agree, however, that § 602(a)(3)(C) “is fairly (and best) read as implicitly authorizing lending, in addition to importation, of all works other than audiovisual works.” Brief for United States as Amicus Curiae 30, n. 6.

 Title 17 U. S. C. § 109(c) provides: “Notwithstanding the provisions of section 106(5), the owner of a particular copy lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to display that copy publicly, either directly or by the projection of no more than one image at a time, to viewers present at the place where the copy is located.”

 The word “copy,” as it appears in § 109(c), applies to the original of a work of art because the Copyright Act defines the term “copies” to “in-clud[e] the material object... in which the work is first fixed.” § 101.

 Principles of fair use and implied license may also allow a U. S. tourist “who buys a copyrighted work of art, a poster, or ... a bumper sticker” abroad to publicly “display it in America without the copyright owner’s further authorization.” Ante, at 537. (The tourist could lawfully bring *585 the work of art, poster, or bumper sticker into the United States under 17 U. S. C. § 602(a)(3)(B), which provides that § 602(a)(l)’s importation ban does not apply to “importation ... by any person arriving from outside the United States . . . with respect to copies . . . forming part of such person’s personal baggage.”) Furthermore, an individual clearly would not incur liability for infringement merely by displaying a foreign-made poster or other artwork in her home. See § 106(5) (granting the owners of copyrights in “literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works” the exclusive right “to display the copyrighted work publicly” (emphasis added)). See also § 101 (a work is displayed “publicly” if it is displayed “at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered” (emphasis added)). Cf. 2 Nimmer §8.14[C][1], at 8-192.2(1) (“[A] performance limited to members of the family and invited guests is not a public performance.” (footnote omitted)).

 Exerting extensive control over secondary markets may not always be in a manufacturer’s best interest. Carmakers, for example, often trumpet the resale value of their vehicles. See, e. g., Nolan, UD Grad Leads Cadillac Marketing, Dayton Daily News, Apr. 2, 2009, p. A8 (“Cadillac plays up its warranty coverage and reliable resale value to prospective customers.”). If the transaction costs of reselling vehicles were to rise, consumers’ perception of a new ear’s value, and thus the price they are willing to pay for such a car, might fall—an outcome hardly favorable to automobile manufacturers.

 It should not be overlooked that the ability to prevent importation of foreign-made copies encourages copyright owners such as Wiley to offer copies of their works at reduced prices to consumers in less developed countries who might otherwise be unable to afford them. The Court’s holding, however, prevents copyright owners from barring the importation of such low-priced copies into the United States, where they will compete with the higher priced editions copyright owners make available for sale in this country. To protect their profit margins in the U. S. market, copyright owners may raise prices in less developed countries or may withdraw from such markets altogether. See Brief for United States as Amicus Curiae 26; Brief for Text and Academic Authors Association as Amicus Curiae 12; Brief for Association of American Publishers as Amicus Curiae 37. See also Chiappetta 357-358 (a rule of national exhaustion “encourages entry and participation in developing markets at lower, locally more affordable prices by eliminating them as risky sources of cheaper parallel imports back into premium markets”). Such an outcome would disserve consumers—and especially students—in developing nations and would hardly advance the “American foreign policy goals” of supporting educa *587 tion and economic development in such countries. Quality King Brief 25-26.